IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROSE URE MEZU,                          *

   Plaintiff,                   *

    v.                        *        Civil Action No. WMN09CV2855

MORGAN STATE UNIVERSITY,                *

   Defendant.                   *

\*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM  IN SUPPORT OF MOTION FOR THE SANCTION OF DISMISSAL
UNDER FED. R. CIV. P. 41 OR
ALTERNATIVELY FOR SANCTIONS UNDER FED. R. CIV. P. 37**

Defendant Morgan State University ("University"), by its counsel Douglas F. Gansler, Attorney

General of Maryland, and Sally L. Swann, Assistant Attorney General, submits this memorandum in

support of its Motion for the Sanction of Dismissal under Fed. R. Civ. P. 41(b), and L.R. 105.8 or

alternatively for sanctions under Fed. R. Civ. P. 37 to order Plaintiff to provide responsive answers in a

second deposition, and to pay the costs and to order Plaintiff to consent to release of medical records for

the depositions of Plaintiff's expert witnesses and to order Plaintiff to provide the disclosure for her

expert witnesses as required under Fed. R. Civ. P. 26 (a)(2)(C) and states the following:

**BACKGROUND**

Plaintiff brought suit against Morgan State University claiming that it interfered with her rights

under the Family and Medical Leave Act (FMLA) during the academic years 2008 - 2009 and 2009 -

2010, and retaliated against her for exercising her FMLA rights, and for filing EEOC complaints and

1

previous lawsuits alleging discrimination.[1]  The specific allegations are that Plaintiff's adult daughter,

Olachi Mezu, required the constant care of her mother in Fall 2009 for almost three months after the

daughter had surgery for a brain aneurysm, and that Morgan's denial of FMLA leave for insufficient

medical documentation was a violation of the FMLA and in retaliation for her exercising her rights

under the FMLA and Title VII.  Plaintiff also alleges Morgan retaliated against her when she requested

bereavement leave in Fall 2008 to bury her mother in Nigeria, and again when she requested FMLA

leave in Spring 2009 for a serious illness which she alleges was caused by Morgan's retaliatory actions.

The discovery deadline in this case is September 21, 2010.[2]  Plaintiff's deposition was held on

August 25, 2010.  During the deposition, Plaintiff's counsel repeatedly violated Rule 30(c)(2) of the

Federal Rules of Civil Procedure which states "An objection must be stated concisely in a

nonargumentative and nonsuggestive manner.  A person may instruct a deponent not to answer only

when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a

motion under Rule 30(d)(3).

Not once during the deposition did Plaintiff's counsel object on the grounds of privilege, but

counsel did object at least 70 times on other improper grounds, and instructed Plaintiff not to answer

---

[1]The other claims alleged in the Complaint– hostile work environment, equal pay act
violation and discrimination based on national origin, were dismissed by this Court.

[2] Plaintiff filed a partial motion for summary judgment before the close of discovery.
Defendant filed a motion to strike Plaintiff's motion for failure to follow the scheduling
requirements of L.R. 105.2 (c) when both intend to file motions for summary judgment. The
motion to strike is pending in this court.

approximately 14 times.  Counsel's  objections[3] were often argumentative, suggested answers to Plaintiff

and also signaled to Plaintiff a way to avoid answering the question, either by failing to remember or by

simply not responding.  In addition, Plaintiff, herself, was noncooperative and evasive throughout the

deposition.  She repeatedly would not respond to the questions, she would lower her eyes and say

nothing for an extended period of time, and thus would signal to her counsel to object.  She responded

with "I don't remember" at least 40 times, and at times when she did not want to answer questions

would answer "you have the information in the documents".  This conduct, by both Plaintiff and her

counsel, was very disruptive and prejudicial to Defendant.  Without Plaintiff's answers, Defendant is

unable to discover the underlying facts to evaluate the merits of Plaintiff's claims, and this severely

prejudices Morgan's defense against her FMLA and retaliation claims as well as her damage claims.

Plaintiff and her counsel have effectively deprived Defendant of the opportunity to have a fair trial.

In addition, Plaintiff is depriving Morgan of its right under Fed. R. Civ. P. 26(b)(4)(A) to depose

the expert witnesses she has named– Dr. Judy Huang and Dr. Raymond Nze– [4] by refusing to make the

required disclosures under Fed. R. Civ. P. 26(a)(2)(C) for expert witnesses (she argues the rule does not

---

[3] The grounds for objections included speculation, asked and answered, relevance, document speaks for itself, badgering, vague and ambiguous, assuming facts not in evidence, lacks foundation, refer to documents, calls for legal conclusion, Complaint has all the information, Plaintiff doesn't have knowledge, calls for a narrative, document speaks for itself, and refuse to answer because case still in discovery.

[4] When the undersigned counsel contacted Dr. Huang and Dr. Nze, the physicians informed defendant's counsel that without a consent to release and discuss the medical records of Olachi Mezu, Plaintiff's adult daughter, and Plaintiff, they would be unable to answer any questions in a deposition.

apply, *see* Exhibits A and B*))*, and refusing to provide a consent to release the medical records of her daughter Olachi Mezu as well as her own medical records.  Moreover, Plaintiff has not provided a complete set of medical records from the expert witnesses in response to Morgan's document production request.  Plaintiff also has not provided her complete medical records (other than an "out-of-work" form) from  Plaintiff's physician in Nigeria.  The discovery deadline is September 21, 2010.[5]

### DISMISSAL UNDER RULE 41

Plaintiff's and her counsel's egregious conduct in her deposition and her equally egregious conduct in attempting to bar Defendant Morgan State University from deposing the named expert witnesses violates the Federal discovery rules and warrants the sanction of dismissal under Fed. R. Civ. P. 41(b) ("[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it."). [6]

---

[5] Defendant notified Plaintiff of the deficiencies in her response to document production request by letter and e-mail dated August 21, 2010.  Plaintiff has since told Defendant that she will not produce the requested medical records, and will not provide the disclosures required for expert witnesses under Fed. R. Civ. P. 26(a)(2).  Defendant has been attempting to confer about the disputes as required under L.R. 104.7, and has set up two telephone dates for the conference, but to date Plaintiff's counsel has been unwilling to confer about the dispute.  If the sanction of dismissal is not ordered by this court, Morgan requests that the presiding judge resolve the disputes on an emergency basis pursuant to the "Emergency Discovery Dispute Resolution Procedure" adopted by the U.S. District Court of Maryland July 2010.  These discovery disputes are an emergency because the discovery deadline in this case is September 21, 2010.

[6]Alternatively, Plaintiff should be ordered pursuant to Rule 37 to appear at a second deposition to provide responsive answers to questions and pay the cost of the second deposition, and be compelled to disclose as required under Rule 26(a)(2)(c) the subject matter of the experts' testimony and the facts and opinions to which the experts are expected to testify, and consent to release the medical records of Plaintiff's adult daughter Olachi Mezu, and her own medical records.

The standard for what is discoverable is set forth in Federal Rule 26. A party is entitled to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense– including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26 (b)(1). "Evidence is relevant if it has any tendency to make more likely, or less likely, any fact that is of consequence to the litigation." Fed. R. Evid. 401.

It is a violation of Fed. R. Civ. P. 30(c)(2), to instruct a witness not to answer a question if it is not necessary to preserve a privilege. The rule states: "An objection [at a deposition] must be stated conclusively in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Thus, a deponent may be questioned about any matter which is relevant to litigation and which is not privileged, and the fact that information may not ultimately be admissible does not mean that it is not discoverable.

In *Boyd v. University of Maryland Medical System*, 173 F.R.D. 143 (D. Md. 1997), this Court noted that "[i]t has been the law in this circuit for 20 years that lawyers may not instruct witnesses not to answer questions during a deposition unless to assert a privilege, " *Id.* at 144, *citing Ralston Purina Co. V. McFarland*, 550 F. 2d 967 (4th Cir. 1977). Instructing a witness not to answer a question during deposition is presumptively improper. 173 F.R.D. at 147.

Whether a presumptively improper instruction warrants the imposition of sanctions pursuant to Fed. R. Civ. P. 37 depends on the Court's assessment of five factors:

>    (1) the importance of the requested information to the issues in the litigation;
>    (2) the number of times that attorney instructed the witness not to answer;
>    (3) whether the question which prompted the instruction not to answer was proper and unobjectionable;
>    (4) whether the instruction not to answer appears to have been made in a sincere, although misguided, effort to preserve a colorably valid objection, or instead, for purposes of disrupting the deposition; and
>    (5) whether the attorney instructing the deponent not to answer had advance notice of the likelihood that the deposing attorney would initiate questions in an area considered objectionable, and whether the attorney sought a protective order pursuant to Fed. R. Civ. P. 26(c).  *Boyd,* 173 F.R.D. at 147.

Similarly, the Court of Appeals for the Fourth Circuit in *Snead v. Automation Industries, Inc.,* 102 F.R.D. 823 (D. Md. 1984) outlined a four part test to evaluate whether to impose the sanction of dismissal under Rule 41:

>    (1) the needs of the discovery party;
>    (2) the nature of the non-compliance;
>    (3) how the absence of such evidence [not produced] would impair [the other party's] ability to establish their case; and
>    (4) whether the non-complying party's conduct would deprive the other party of a fair trial.  *Id.* At 829, citing *Wilson v. Volkswagen of American, Inc.,* 561 F. 2d 494, 505 (4th Cir. 1977).

See also, *Arodyne Systems Engineering, Ltd. v. Heritage International Bank*, 115 F. R. D. 281, 288 (D. Md. 1987) (conduct of plaintiff and counsel was found to be sufficiently egregious to warrant dismissal under Rule 41(b) after evaluating: "1) the degree of personal responsibility on the part of the plaintiff; 2) the amount of prejudice to the defendant caused by the delay; 3) the presence or absence of a "drawn out history" of "deliberately proceeding in a dilatory fashion," and 4) the effectiveness of sanctions less drastic than dismissal").  *See also, Diamond v. Bon Secours Hospital*, 2010 WL 2696632 (D, Md.)

6

(applying the above criteria and ordering the sanction of dismissal).

There can be no doubt that Plaintiff and her counsel intentionally have failed to comply with the Federal Rules. From the very beginning of Plaintiff's deposition, plaintiff counsel's demonstrated an intent to disrupt the deposition by repeatedly objecting with no valid basis. (A copy of the complete transcript is attached). She objected to background questions, such as when she came to the United States to live (T. 15), how many months of the year she lived in Nigeria, (T. 8), her ability to work legally in Nigeria, (T. 19 - 21), the number of classes she taught each semester at Morgan, (T. 17), and whether she did outside consulting work. (T. 18). In addition to the objections being baseless, they were not stated concisely in a non-argumentative and non-suggestive manner as required under Fed. R. Civ. Proc. 30(c)(2). Counsel repeatedly argued with Defendant's counsel, demanded Defendant explain the relevance of many questions, and would not let the Plaintiff answer certain questions. T. 20.

The pattern of baseless, improper objections continued throughout the deposition on questions critical to Morgan's defense of the allegations that it violated the FMLA and retaliated against her exercising her rights under the FMLA and Title VII. The improper responses of Plaintiff concern four times periods:

1) Fall Semester 2008 when Plaintiff alleges she was encouraged to apply for FMLA leave when the appropriate leave was bereavement leave to bury her mother in Nigeria;
2) Spring Semester 2008 when Morgan allegedly retaliated against Plaintiff by assigning her to an unheated classroom, which caused her to become seriously ill and for which she required FMLA leave;
3) Fall Semester 2009 when Morgan denied her FMLA leave because of insufficient medical documentation;
4) Academic years 2008-2009 and 2009-2010 during which Plaintiff alleges Dr. Dolan Hubbard, the Chairperson of the English and Language Arts Department, retaliated against her, i.e. by requiring her attendance at various meetings, including one in August 2009 when her daughter was sick.

The sheer number of objections demonstrates counsel's intention to disrupt the deposition.  She objected a total of 70 times, and the objections were not made in a concise and nonargumentative manner.  The numerical breakdown of counsel's objections is as follows:

a) speculation– 17 times (x);
b) asked and answered– 9x;
c) relevance- 8x;
d) document speaks for itself- 14x;
e) badgering - 7x;
f) vague and ambiguous- 6x;
g) assuming facts not in evidence - 1x;
h) lacks foundation- 2x;
i) refer to documents- 6x;
j) calls for legal conclusion- 4x;
k) Complaint has all the information 3x;
l) Plaintiff doesn't have knowledge- 1x;
m) calls for a narrative- 1x;
n) document speaks for itself- 1x;
o) refused to answer because case still in discovery- 1x;

Plaintiff's counsel instructed the witness ***not to answer 14 times*** on issues critical to the defense.

**A.      Spring Semester 2008 Leave**

Plaintiff's counsel would not allow Plaintiff to answer questions about the basis of her contention that Morgan violated her FMLA rights in Spring 2008.  The exchange at T. 129-132 is as follows:

> Q.  Are you contending that the actions of Morgan in the spring of 2008 regarding your request for FMLA leave violated, interfered with your FMLA rights, in any way."
>> *Ms. Ibe:. It calls for a legal conclusion. I object. (T. 129, L. 13-14)*
>> Ms. Swann: You can still answer the question.
>> *Ms. Ibe: It calls for a legal conclusion.  She doesn't have to respond to it. (T. 129, L. 17-18)*
>
> Q.  Are you contending that anything in regard to Morgan's actions with regard to the spring, 2008 request for FMLA leave interfered with your ability to get leave?
> A. (No response.) *(T. 130, L. 4)*

Q. You have to answer.
> *Ms. Ibe: She doesn't have to respond to a legal conclusion. She doesn't need to. (T. 130, L. 6-7)*
> Ms. Swann: It is not a legal conclusion.

Q. Did anything interfere with your ability to get leave?
> Ms. Swann: That is not a legal conclusion. It is factual.
A. (No response.) *(T. 130, L. 13)*
. . . .

Q. "Dr. Mezu, I don't know what is going on.  You are sitting there looking down.  Are you going to answer?  Did you get FMLA leave?  This is Spring 2008.  We are just talking about that.  Did you get FMLA Leave?
A. I sent the form that I had filled out.  I sent it to the school.

Q. Okay, was it approved in?
A. I don't know. *(T. 131, L. 2)*

Q. Because the letter you got– the letter dated–
A. I don't remember that letter. *(T. 130, L. 131)*

Q. That is the only reason you don't know [if you got FMLA leave] you don't recall the answer.
A. I am not answering anything in the process. *(T. 130, L. 7)*

Q. . . . . Are you alleging that Morgan never answered your requests for FMLA leave in 2008.
> *Ms. Ibe: I will object to vague and ambiguous. There are two FMLA applications here. (T. 131, L. 12-13)*
> Ms. Swann: This is the February 2008... I said this is what we are talking about.

After several more questions without responses, Defendant's counsel noted for the record that Plaintiff

refused to answer.  T. 132, L. 8-10.  Plaintiff's counsel then stated:

> *Ms. Ibe: She already referred you to the Complaint. T. 132, l. 11- 12.*
> *       . . . .*
> *The Complaint has all the information there. T. 132, l. 16-17.*
> *       . . . .*
> *For the record, on the last issue, 2008, was a long time ago and these are things that happened a long time ago.  So, she is not expected to remember each and*

*every single detail.  (T. 135, L. 2-6)*

Defendant then asked Plaintiff if she had been docked pay in Spring 2008 when she was out sick on leave.  Plaintiff would not respond. T. 135, L. 10.  When asked if she was refusing to answer the question, plaintiff would not respond. T. 135, L. 19.

**B.      Fall Semester 2008 Bereavement Leave.**

Plaintiff has alleged that Morgan retaliated against her by giving her the wrong form (FMLA) for leave to bury her mother in Nigeria, that she was never informed if bereavement leave had been granted, and that Dr. Hubbard, the English Department Chairperson retaliated against her during this time. Counsel objected to the following at T. 34-39:

> Q. Why did you write this document [Letter to Dr. Hubbard re request for bereavement leave, Dep. Ex. 1]? (T. 34, beginning at l. 13)
> A. Because I received a letter from America while I was burying my mother, telling me they had denied FMLA Leave.  The forms they had given me and I had filled them out. Suddenly, they told me I was not entitled to FMLA leave.  They told [me]to apply for bereavement.  So, I applied for bereavement.
>
> Q. ...The next letter is Burial of a Parent, to Dr. Armada Grant, from you. Why did you write this letter? (T. 34).
> A. Well, what the letter say, when I came to the office–
>       *Ms. Ibe: Objection. The document speaks for itself.* (T. 35, L. 4-5.)
>
> Q. I said why did you write the letter?
>       *Ms. Ibe: She wrote it.* (T. 35, L. 7.)
>
> Q. Why did I– in answer to what she asked me to write.
>
> Q. ...The Bereavement Leave Document, you wrote this to Miss Grant on December 11th and why did you write this e-mail?
> A. Which e-mail?
>
> Q. It is the last document.
>       *Ms. Ibe: Objection. The document speaks for itself. The reasons are in there.* (T.

10

35, L. 18- 19.)
Ms. Swann: Well, she can still answer.
*Ms. Ibe: The reasons are in there.* (T. 35, L. 21.)
. . . .

Q. Now, what is your understanding of what FMLA leave is for? (T. 37, L. 12-13.)
A. If you have a serious– if you have a serious–a member of your family is in a serious situation, to be able to take care of your family member.

Q. What do you understand in regard to someone dying.
A. Let me say this again.
   *Ms. Ibe: Call for speculation. I object to that. (T. 37, L. 21.)*
   Ms. Swann: No, I mean, you can answer this. You know, it goes to the very heart of the issues...

Q. The question is: As you describe FMLA leave, how does your understanding of what– how do you understand a burial of a parent as fitting in a FMLA leave?
   *Ms. Ibe: I object to that. (T. 38, L. 9)*
   Ms. Swann: You can answer.
   *Ms. Ibe: It calls for speculation. (T. 38, L. 11)*
   Ms. Swann: She had to have some sort of understanding.
   *Ms. Ibe: It calls for speculation. (T. 38, L. 14)*
   Ms. Swann" It is discovery. This is not– we are not at trial.
   *Ms. Ibe: It calls for speculation. She is not supposed to speculate to her understanding of something.(T. 38, L. 17-19)*
   Ms. Swann: It is not speculation.
   *Ms. Ibe: It is speculation. (T. 38, L. 21)*

Q. What do you understand? How do you understand a burial to fit into FMLA Leave?
   *Ms. Ibe: It calls for speculation. I instruct you not to answer that. (T. 39, L. 3-4)*

The objections continued when Plaintiff was asked if she had looked at the FMLA form that she was given when she needed leave to bury her mother in Nigeria.  Plaintiff would not answer. *(*T. 39 - 40).

Q. Is it you allegation that giving you a form that was for FMLA, when they knew it was Bereavement Leave, is that your allegation, that it was retaliation under Title 7 [VII]?
A. Giving me the wrong form, if it is the wrong form.

Q. Now, did you look at the form when they gave it to you?
A. I had just lost my mother. I wanted leave.

11

> Q. Did you look at the form?
> A. I believe I have answered.
>
> Q. Did you look at the form when she gave it to you.
> > *Ms. Ibe: She has answered the question. (T. 40, L.1)*
> > Ms. Swann: she has not answered the question.
> > *Ms. Ibe: She did give an answer. (T. 40, L. 4)*
>
> Q. Did you look at the form when she gave it to you?
> > *Ms. Ibe: I object. You are baderging her. (T.40, L. 7)*
> > *Ms. Swann: I am asking a question that is highly relevant.*
> > *Ms. Ibe: I mean, it calls for speculation. "Her mother just died. She doesn't remember what she did." (T. 40, L. .17-18)*

These questions were important to Morgan's defense because if Plaintiff looked at the FMLA form and understood that FMLA was different from bereavement leave, she intentionally did not ask for the bereavement leave form.

To evaluate Plaintiff's contention that she was being retaliated against when her chairperson asked about her intention to return for the remaining weeks of the Fall Semester 2008, Defendant asked questions about the timing of her plans to return to the United States after her bereavement leave. (T. 24-25):

> Q.  What was the date of the [plane] reservation to return home?
> A.  I don't remember.
>
> Q. Was it five days after November 26th?
> > *Ms. Ibe: She said she doesn't remember. (T. 24, L. 9)*
> A.  I don't remember.
>
> Q. Was it ten days?
> > *Ms. Ibe: Asked and answered. I am object[ing]. (T. 24, L. 12)*
> > Ms. Swann: It wasn't asked and answered, ten days.
> > . . . .
> > *Ms. Ibe: I am directing you not to answer. She is not going to speculate and give you dates she is not sure about. (T. 24, L. 18-20 )*

Q. So the ten days, she won't answer. Had you made the reservation for fifteen days?
A. I don't really remember. *(T. 25, L. 2)*

Plaintiff also expressed that Morgan retaliated against her by not giving her more than 5 days of bereavement leave, as provided for under the bereavement policy.  She viewed five days as insufficient time.  Consequently, Defendant's counsel asked how much time she would have needed. T. 61-65

Q. Do you have any knowledge of any other person who has received more than five days of bereavement leave?
A. I don't know if I can answer. I can only address what happened to me. *(T. 61, L. 10-11)*

Q. I am asking your knowledge of anybody else receiving more than five days?
A. I just know you have to travel–

Q. It is a yes or no question.
A. If you have to travel three days to bury a parent–

Q. It is a yes or no question.
    *Ms. Ibe: I object She doesn't have the knowledge. She cannot answer. (T. 61, L. 19-20)*
    . . . .

Q. Is it your contention you should have gotten how much leave?
A. Enough time to bury my parent.

Q. How long would that be?
    *Ms. Ibe: You are asking her to speculate. (T. 62, L. 9)*
    Ms. Swann: She is saying she needs more than five days.

Q. How many more days do you need?
    *Ms. Ibe: How many has already passed? How many days she wanted in the past is not relevant.  It is in the past. (T. 62, L. 13-15)*
    . . .
    *Ms. Ibe: You are asking her to speculate. (T. 62 - 63)*

When Plaintiff refused to answer the question, the following was asked;

Q. Are you admitting that five days leave was sufficient time to bury your mother?

> *Ms. Ibe: she is not admitting that. (T. 63, L. 7)*
> . . . .
> Q. I am asking you, are you admitting that five days was sufficient time to bury your mother?
> A. (No response).
>
> Q. Are you going to answer?
> > *Ms. Ibe: She already answered you. (T. 63- 65)*

To evaluate Plaintiff's claim that she needed more time to bury her mother, Defendant was entitled to the answer to these questions. If she did not need any more time, obviously her claim that having only five days of bereavement leave was retaliatory is untrue.

**C.      Fall Semester 2009**

Plaintiff has alleged that Morgan violated the FMLA when it did not approve her request for FMLA leave in August 2009 so that she could care for her adult daughter, age 33, who had surgery for a brain aneurysm in early August 2009. Plaintiff's counsel improperly objected to a question about her daughter's condition. T. 138- 145.

> Q. What happened to her [Olachi Mezu]?
> A. It's all in the records.
> . . . .
> A. I have already answered the dates and the interrogatories and the motions and everything is there. T. 138. L. 11-12.
>
> Q. This is a deposition. It is different. It is part of the discovery process. Under the Federal Rules, when you appear for a deposition, you are required to answer the questions. It doesn't really matter if there are other documents out there, that you have, in writing, put down the answers. This is a separate procedure. So, if you can tell me, in your own words, what happened to her. It is just a preliminary question.
> A. I have given you the records.
> > *Ms. Ibe: I will object because it calls for a narrative. You need to be specific what it is you are referring to. There is a world of information out there. You are asking what happened to her." (T. 139. L. 2-5)*

14

Plaintiff was even evasive in her answers to questions about how long her adult daughter was in the hospital. T. 141.

> Q. "So, how long did your daughter remain in the hospital?
> A. I can't quite remember.  I can't remember right now." (T. 141, L. A.)

Defendant's counsel asked if Plaintiff would have been able to come to a meeting at Morgan with Dr. Hubbard on August 17, 2009 at 2:00 p.m. if her daughter were still in the hospital. T. 144 - 145. Plaintiff's counsel objected.

> *Ms. Ibe: That calls for speculation. (T. 145, L. 15)*
> Ms. Swann: You can still answer.
> *Ms. Ibe: To plaintiff. You don't have to answer. (T. 145, L. 17)*
> Ms. Swann: She does have to answer. That is not a proper reason not to respond.
> *Ms. Ibe: It calls for speculation. (T. 145, L. 20)*
> . . . .

> Q.  I am asking you a question. You have to respond to it. If your daughter was in the hospital, would you have been able to come to this meeting [with Dr. Hubbard]?

> *Ms. Ibe: She already responded. (T. 146, L. 12)*
> Ms. Swann: Excuse, me. She is beginning to respond.
> *Ms. Ibe: She already responded. (T. 146, L. 16)*
> A.  I was telling you that I had already answered you that question.

> Ms. Swann: So you are refusing to answer that question. That is on the record. (T. 146, L. 18 - 19)

Not answering deprives Defendant of the ability to evaluate her claim that she was being retaliated against when she was required to attend a meeting at Morgan when she was at home caring for her daughter.

Plaintiff contends that her chairperson, Dr. Hubbard, knew of her request for FMLA leave as of August 18.  Defendant asked questions to discover when Plaintiff notified Dr. Hubbard of her leave

request.  Plaintiff was evasive in her answers and did not remember if there was anything showing that she had notified Dr. Hubbard of her need for leave by August 18. T. 146- 147.

> Q. Do you have any documentation that shows that this letter dated August 18th from Tonya Cooper in Doctor [Huang] office . . . that you gave a copy of everything to Dr. Hubbard?
> A.  I sent a copy of everything to Doctor Hubbard. He wrote back to me threatening me again with termination.
>
> Q. My question is: Do you have anything that shows you sent it to Doctor Hubbard?
> A. I don't remember now. *(T. 147, L. 10)*
>
> Q. You don't remember. Okay. That's fine.
> A. At this time. *(T. 147. L. 10)*

When asked whether she had called Doctor Hubbard to tell him you couldn't make the meeting, she could not remember if she called him, and although Plaintiff answered that she had e-mailed him, she could not remember if it was before or after the scheduled meeting. T. 147- 148.

> A. I emailed him. I emailed him.
>
> Q. That same day of the meeting, before the meeting, after the meeting?
> A. I don't remember. *(T. 148, L. 10)*
>
> Q. But do you remember whether you called him or not in addition to an e-mail?
> A. I don't remember. *(T. 148, L. 13)*

Defendant needed to discover where Plaintiff's adult daughter lived and the name of the husband and was entitled to this information to attempt to verify Plaintiff's claims that her daughter was helpless for three months and had to live with Plaintiff in her home.  Plaintiff's counsel repeatedly objected on the grounds of relevance and Plaintiff herself simply would not respond to the questions. T. 167-170.

> Q.  Is your daughter married. *(T. 167, L. 10)*
> A.  Yes she is married.

16

Q. Does she have her own home?
A. She does have her home, yes.

Q. What is her address?
A. I don't have it here. *(T. 167, L. 15)*

Q. Pardon?
A. I don't have the address.
> *Ms. Ibe: What is the relevance? (T. 168, L. 1)*

Q. Does she live in Baltimore City
A. No.

Q. Where does she live.
A. What is the relevance?
> Ms. Swann: You can object, but you have to answer the question.
> *Ms. Ibe: I object What is the relevance where she lives. (T. 168, L. 4-5)*
> Ms. Swann: We don't have to go through this. It is discovery. As long as you preserve your objection on the record, we [sic] can make it in court.

Q. Where does she live?
A. I don't know the address.

Q. Do you know what city or town she lives in?
A. No response. *(T. 168, L. 12)*

Q. Are you refusing to answer.
A. No response. *(T. 168, L. 14)*

Q. You have to say yes or no if you are refusing to answer.
> *Ms. Ibe: You have to state the relevance. (T. 168, L. 17)*
> Ms. Swann: No, we don't have to state the relevance.
> *Ms. Ibe: You have to state the relevance. (T. 168, L. 20)*

Q. You daughter, if you don't know her exact address, what state does she live in? Does she live in Maryland. It is on her web site where she works.
A. No response. *(T. 169, L. 3)*

Q. I will ask you again. Where does she live?
A. No response. *(T. 169, L. 5)*
> Ms. Swann: So I will take that as a refusal to answer what city and state her

daughter lives in.

Q. What is the name of your daughter's husband?
A. No response. *(T. 169. L. 11)*

Q. What is the name of your daughter's husband?
A. You said you have the web site.

Q. What is the name of your daughter's husband.
    *Ms. Ibe: What is the relevance of this? (T. 169, L. 11)*

Q. What is the name of your daughter's husband?

    . . . .
Q. What is his name?
A. No response. *(T. 170, L. 2)*
    *Ms. Ibe: This is not relevant to anything. (T. 170, L. 3)*

Plaintiff's response to the interrogatory from Defendant asking for the names of all persons who have

personal knowledge of the facts of the case did not include the husband's name or the name of Plaintiff's

other children. At deposition, Defendant asked about this. T. 170 - 173.

Q. Are you saying now, under oath, that her husband has no personal knowledge of her
care, of her illness.
A. No response. *(T. 171, L. 3)*

Q. You have to answer whether you are saying he has no personal knowledge. You will
not give me his name.
    *Ms. Ibe: Because it is not relevant. (T. 171, L. 7)*

Ultimately, plaintiff refused to answer the questions. T. 172, L. 5- 10.

Q. Do any of your other children have personal knowledge of your daughter's illness and
her care afterwards?
A. No response. *(T. 172, L. 14)*

Q. Are you refusing to answer?
    *Ms. Ibe: It calls for speculation. This is after the fact. (T. 172, L. 16-17)*

Q. Were they in the hospital? You said family was all around.

18

*Ms. Ibe: Right. But all of these people, they were not there when it happened. (T. 173, L. 2-3)*
Ms. Swann: I am not talking about when it happened, I am talking about anytime. I am talking about when she [daughter] was in the hospital and her care afterwards, when she was in your home.

Q. Who had personal knowledge of that?
*Ms. Ibe: She already give [sic] you the names. (T. 173, L. 9)*

After some further questioning, plaintiff answered "I don't remember now." *(T. 173, L. 21)*

Defendant asked about the wedding date of another daughter, Ure Mezu, who was married in Fall 2009 to evaluate the claim that Plaintiff's daughter required the constant care of Plaintiff at the time of the wedding. Plaintiff was evasive again, and answered that she could not remember the date or month of her daughter's wedding. T. 176 - 181.

Q. Did any of your daughters get married in the fall of 2009? *(T. 176, L. 14-15)*
A. Yes.

Q. Which daughter was that?
A. Ure.

Q. Ure. Where does she live?
A. Pittsburgh.

Q. Where did she get married?
A. Here in Maryland.

Q. What was the date of her wedding?
A. I don't remember. What is the relevance? *(T. 177, L. 3)*

Q. What is the date of her wedding, what month.
A. I can't remember. *(T. 177, L. 8)*

Q. Was it sent–
*Ms. Ibe: She already said she can't remember the date. (T. 177, L. 10)*
*. . . .*
*Ms. Ibe: Objection, she said she doesn't remember. You have asked and asked the*

19

*question. She said she doesn't remember. (T. 178, L. 5-7)*

Defendant then asked if she had been married in September, October or November.

*Ms. Ibe: She already told you she doesn't remember the date. (T. 178, L. 13-14)*
*Ms. Ibe: Objected on grounds of badgering. (T. 181, L. 5-13)*

When asked the name of Ure's husband, Ms. Ibe objected on relevance grounds. *(T. 181, L. 5-13)*

A. How does this explain Armada Grant taking me off the payroll for 12 weeks.

Plaintiff refused to answer the question. Later, plaintiff also refused to answer whether Olachi Mezu's

husband was living in Plaintiff's home when her daughter was recuperation. T. 186.

Q. Did she [the daughter] have to be in a wheelchair?
A. Yes, she was in a wheelchair for a time.

Q. How long?
A. I don't remember. *(T. 186, L. 6)*

Q. During that time, was her husband living with her in your home?
A. I can't answer that question. *(T. 186, L. 9)*

Q. You can't answer the question? Why is that?
A. I can't answer. *(T. 186, L. 12)*

Q. Why is that?
A. I have to do with something else. I can't answer that. This deals with me and my daughter. *(T. 186, L. 14-15)*

Q. You are refusing to answer the question whether he husband was living with her while she was in your house?
A. No response. *(T. 186, L. 19)*

Ms. Swann: It is a yes or no question. The plaintiff refuses to answer that
question. *T. 186, L. 20-21)*

The information sought was necessary to evaluate and verify Plaintiff's claims that she needed to

provide daily, continuous care for her adult daughter for 3 months after her surgery, up to the very day

20

that her daughter returned to work.

Defendant submits that Plaintiff's refusal to answer questions critical to the defense, which is in violation of the Federal Rules warrants dismissal under Rule 41, or alternatively, an order to compel Plaintiff to appear at a second deposition.

Likewise, Plaintiff's refusal to disclose information about the expert witnesses she intends to call at trial is egregious conduct in violation Fed. R. Civ. P. 26(a)(2)(C), as is Plaintiff's failure to provide complete medical records that were requested in discovery, and a consent to release the complete medical records of Oachi Mezu from Dr. Judy Huang, and Plaintiff's medical records from Dr. Raymond Nze so that Defendant has the opportunity to depose the expert witnesses which is its right under Fed. R. Civ. P. 269b)(4)(A).  Without the medical consent to release the information, Defendant will be deprived the opportunity to discover essential facts that either support or do not support Plaintiff's claim. Plaintiff's action is without justification and deprives Defendant the right to defend itself.

Similarly, by refusing to disclose complete medical records from her physician in Nigeria, Plaintiff has deprived Defendant of the right to discover the facts about her medical condition when she was in Nigeria before returning to the United States and Morgan in Spring 2009.  Shortly after Plaintiff returned to the United States, she suffered a serious illness which she contends is the fault of Morgan.[7] The deposition testimony of Dr. Huang and Dr. Nze will be critical to Defendant's ability to evaluate and defend against Plaintiff's claims that FMLA leave was necessary to provide daily care to her adult

_____

[7] When the undersigned counsel contacted Dr. Huang and Dr. Nze, she was informed that without a consent to release and discuss the medical records of Olachi Mezu and Plaintiff, they would be unable to answer any questions in a deposition.

daughter for 3 months in Fall Semester 2009, and that Morgan's alleged retaliation against her in Spring 2008 caused Plaintiff to become deathly ill.[8]

In conclusion, Defendant requests dismissal of Plaintiff's Complaint.  Her blatant disregard for the discovery rules warrant dismissal.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

_____/s/_____
SALLY L. SWANN
Assistant Attorney General
Federal Bar No.: 06731

Educational Affairs Division
200 St. Paul Place, 17th Floor
Baltimore, MD 21202-2021
Telephone: (410) 576-7053
sswann@oag.state.md.us

---

[8] Defendant notified Plaintiff of the deficiencies in her response to document production request by letter and e-mail dated August 21, 2010.  Plaintiff has since told Defendant that she will not produce the requested medical records, and will not provide the disclosures required for expert witnesses under Fed. R. Civ. P. 26(a)(2).  Defendant has been attempting to confer about the disputes as required under L.R. 104.7, and has set up two telephone dates for the conference, but to date Plaintiff's counsel has been unwilling to confer about the disputes.