**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROSE URE MEZU | : |
|     Plaintiff, | : |
| | : |
|    v. | :  Civil Action No. WMN-09-2855 |
| | : |
| MORGAN STATE UNIVERSITY, | : |
|    and | : |
| ARMADA  W. GRANT, | : |
| in her personal capacity and | : |
| as Director, Human Resources/Payroll | : |
| for Morgan State University, | : |
|    and | : |
| DOLAN HUBBARD, | : |
|  in his personal capacity and | : |
| as Chair,  Department of English | : |
| and Language Arts, | : |
| Morgan State University, | : |
|     Defendants. | : |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SANCTIONS**

C. Valerie Ibe, Esq.
Law Offices of C. Valerie Ibe,
A Professional Law Corporation
23614 Nadir Street
West Hills, California 91304
Tel. 818-346-8777
Counsel for Rose Ure Mezu, Ph.D.

John M. Singleton, Esq.
Singleton Law Group
400 Redland Court, Suite 107
Owings Mills, MD 21117
Telephone: 410-902-0073
Fax: 410-902-7372
Counsel for Rose Ure Mezu, Ph.D

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

FACTUAL BACKGROUND...................................................................................................2

DISCUSSION...........................................................................................................................5

I.  The Motion Falsely Suggests that Plaintiff Failed to Produce Documents Defense
   Counsel Had Received *Before* The Motion Was Filed........................................................6

II.  Defendant Seeks Sanctions For Failure To
   Make Expert Disclosures For Non-Existent Experts.............................................................8

A.  Olachi's Treating Physicians Are Not Plaintiff's Expert Witnesses.......................................8

B.  Neither of Olachi's Treating Physicians--Nor Any Physician--
   Could Offer a Relevant Expert Opinion................................................................................10

III.  Plaintiff Has Produced All Medical Records Within Her Control.......................................13

A.  Defendant Has No Right to Ask Dr. Mezu to Produce a Third Party's Medical
   Records and Dr. Mezu Does Not Have a Right nor the Ability to Produce Them...............15

1.  The Medical Records In Question Belong to a Third Party..................................................15

2.  That Third Party's Medical Records
   Have No Relevance to theFMLA Claim................................................................................17

IV.  Defendant Cannot Seek Sanctions Simply Because Its Counsel
   Exhibited Bad Manners and Poor Interrogation Skills.........................................................18

A.  Defense Counsel Engaged in Abusive
   Tactics During the Depositions.............................................................................................18

B.  Defendant's Inquiry Into the Mythical "Spring 2008"

Claims...................................................................................................................................22

C.  Defendant's Citation of the Record is Incomplete and Misleading......................................23

D.  Defendant Sought to Invade the Privacy
   of Non-parties to Seek Irrelevant Information......................................................................23

IV.  Meanwhile, Defendant Continues To Ignore Its Own Discovery Obligations....................24

CONCLUSION.................................................................................................................24

iii

**INTRODUCTION**

It is ironic that defendant, having refused to produce most of the documents requested of it, and having failed to respond at all to the motion to compel plaintiffs were forced to serve on it-- although months have passed since that response was due-- now raises the alarm that it believes it has not received sufficient discovery. However, defendant, apparently having failed to pay attention to this case even since it forgot to answer the complaint in a timely fashion and faced a default, has mistakenly asked plaintiff for disclosures from non-existent expert witnesses[1] and apparently cannot distinguish plaintiff from her grown daughter, asking plaintiff to produce her grown daughter's medical records, and protests about its inability to obtain information about *non-existent* claims.

Defendant also protests at the deposition it took of plaintiff.  The Court, reading those protests, might look at the Amended Complaint to try to match it up with what defendant says about plaintiff's claims, and be mystified.  Defendant appears to be trying to defend against claims that do not even exist in that complaint, and is protesting how hard it was for her to obtain discovery about these non-existent hypothetical claims defense counsel invented in her own mind.[2]  In fact, defense counsel seems never to have read the Amended Complaint,

---

1  To be clear, the witnesses exist but they are not expert witnesses, and have never been retained as such.

2        See, e.g.,  Defendant's Memorandum at 6: "Plaintiff's counsel would not allow Plaintiff to answer questions about the basis of her contention that Morgan violated her FMLA rights in Spring 2008 The ***Amended Complaint does not anywhere state that MSU violated plaintiff's FMLA right in the spring of 2008.***  If defense counsel would pay attention to the pleadings, much of this wasted time could be avoided.

        Similarly, defendant states, ""Shortly after Plaintiff returned to the United States [after burying her mother] she suffered a serious illness which she contends is the fault of Morgan."  (Defendants' Memorandum at 21).  There is no claim whatsoever in the complaint that MSU made Dr. Mezu ill after returning from Nigeria.  The serious illness she suffered was the year before.  The actions of MSU in response to her trip to bury her mother, including the harassing actions of her department chair, Dolan

1

because her entire memorandum discusses claims that do not exist, and factual allegations that are not being made, at length.   Given defendant's lack of attention to critical details, it may not be surprising that she ignored the reality of the deposition in favor of a version that exists primarily in her head.  The reality of that deposition, rather than the selected out-of-context quotes that defendant uses in its memorandum supporting this motion, is detailed in the attached Appendix.

What is most distressing about defendant's motion, however, is that the motion misrepresents what documents plaintiff produced.  Not to put too fine a point on it, but defendant appears to either have intentionally lied to the court, or been grossly careless about the truth.  The memorandum clearly suggests that Dr. Mezu's medical records have not been produced-- but they have, and as will be noted below, defense counsel used them at her deposition.  The memorandum also seems to claim that plaintiff refused to engage in negotiations about its objections to discovery requests-- without ever mentioning that plaintiff voluntarily produced all of her documents despite those objections.

## FACTUAL BACKGROUND

Plaintiff's Amended Complaint alleges that her employer, defendant Morgan State University, interfered with her rights under the Family and Medical Leave Act (FMLA) by refusing to comply with the FMLA's regulations in handling her request for leave in the fall of 2009, by denying her that leave, and alleging that MSU retaliated against her for asserting her FMLA rights, and also retaliated against her because of her earlier attempts to assert her rights

---

Hubbard, are detailed as examples of the hostile working environment that existed in retaliation for her filing her earlier Title VII claims, but there is no claim in the Amended Complaint that MSU made her sick.

under Title VII through the filing of charges with the EEOC.

Dr. Mezu, an associate professor at MSU, is a Nigerian-born woman.  The Amended Complaint, raising allegations under both Title VII and the FMLA, details a long history of discrimination and retaliation against Dr. Mezu.  That discrimination and retaliation have been channeled largely through Dolan Hubbard, her department chairman, but as recent events have clearly highlighted, the university's hostile actions are not limited to those taken by Hubbard. MSU's institutional hostility toward Dr. Mezu was most recently manifested when she faced a personal crisis due to her daughter's life-threatening brain injury.

In the late evening of Monday, August 3, 2009, Dr. Mezu and her daughter Olachi Mezu and other family members were returning from New York, when Olachi began to suffer a horrible headache.  Within hours, she was being airlifted to Johns Hopkins University Hospital in the morning hours of Tuesday, August 4th.  When she arrived, she was rushed into emergency surgery.  That surgery took more than seven hours.  She had suffered a ruptured cerebral aneurysm.  That means she suffered  "bleeding in the area between the brain and the thin tissues that cover the brain,"[3]  because of "an abnormal bulge or ballooning in a blood vessel supplying the cerebrum (brain). The weakened area forms a sac that fills with blood."[4] This ballooned blood vessel, in other words, suddenly burst or ruptured in Olachi's brain. "People who have a subarachnoid hemorrhage have a 30 percent to 50 percent chance of death within 30 days; half of those who survive end up disabled."[5]

Ten days later, Olachi was discharged, but had several months of convalescence ahead

---

3        http://www.nlm.nih.gov/medlineplus/ency/article/000701.htm.
4    http://www.mayoclinic.org/cerebral-aneurysm.
5    http://www.mayoclinic.org/cerebral-aneurysm.

of her.    Someone needed to take care of her, and the person who could do so was her mother, Dr. Rose Ure Mezu.  Dr. Mezu helped her with all daily activities, including all trips to the bathroom to relieve herself, helping her shower, giving her medication all during the day at the prescribed times, testing her for motor skills after each medication, and of course providing her with meals.  Dr. Mezu transported Olachi to doctor's visits and other physical therapy.

As detailed at length in plaintiff's recent motion for partial summary judgment, Dr. Mezu sought leave from her employer, Morgan State University (MSU) under the FMLA.  She produced medical certifications, and answered all questions, but in a host of ways, MSU ignored its obligations under the FMLA, ignored deadlines for actions required of it under the FMLA,[6] and finally, denied that leave for no valid reason.  Instead, even after Dr. Mezu returned to work on December 4, 2009, MSU refused to pay her any salary or benefits for *two more months.*  It only started to pay her again after facing this Court's threat of a preliminary injunction.

The denial of FMLA leave, as well as the refusal to pay plaintiff for two entire months, is part of a pattern of hostile bureaucratic actions taken against Dr. Mezu in retaliation against her for asserting her rights under Title VII and for seeking leave under the FMLA that continue to this day.

Unfortunately, from the beginning of this litigation, defendant's actions have manifested the apparent attitude that it need not bother to comply with the rules of this court or abide by its obligations under those rules.  Starting with defendant's cavalier failure to bother answering the

---

6  Much as it has continued to ignore its obligations and deadlines during this litigation-- it defaulted in answering the complaint, ignored its discovery obligations, has yet to respond to a pending motion to compel.

complaint until faced with default (Docket Number 7, clerk's entry of default), manifestations of that attitude have continued with refusing to produce almost all relevant documents requested of them (see Docket Number 54, plaintiff's motion to compel), refusal to abide by Local Rule 104's negotiation procedures to resolve the dispute over their refusal to produce relevant materials but at the same time invoking that same local rule to avoid taking any responsibility for its recalcitrance (*id*.), to refusing to respond to a pending motion to compel (*id*., to which no response has been served or filed), defendant has refused to participate in this litigation except when participation might be to its advantage.

## **DISCUSSION**

Despite its many failures to cooperate in discovery, now defendant seeks sanctions for plaintiff's alleged failures in the discovery process.  However, defendant's motion badly misstates the facts.

The motion seeks sanctions for plaintiff's supposed failure to produce documents that plaintiff has in fact produced.  The motion seeks sanctions for failure to produce expert disclosures for witnesses who plaintiff has not even sought to retain as expert witnesses. The motion seeks sanctions for failure to produce medical records that do not belong to plaintiff but to a third party who is not a litigant in this action, records plaintiff does not control and which plaintiff has no right to produce if she had them, as they are another's confidential property. The motion, finally, seeks sanctions for plaintiff's alleged recalcitrant behavior during a deposition, when in fact the difficulties in that deposition arose from defense counsel's harassing behavior, irrelevant and hostile questions, and inability to accept answers she did not like.

First, plaintiff must address the very important but entirely inaccurate claims defendant

5

made in her motion but did not discuss at any length, the claims that plaintiff has not made

expert disclosures or produced medical records.

Even before turning to those issues, however, plaintiff must address another

misimpression that might arise from the defendant's memorandum supporting its motion for

sanctions. In the two footnotes of that memorandum  (page 4, footnote 5 and page 22, footnote

8), defendant states that plaintiff has not produced documents that defendant requested, and has

refused to hold conferences.  That false impression must be corrected before turning to

substantive matters.

I.      **The Motion Falsely Suggests that Plaintiff Failed to Produce Documents Defense
        Counsel Had Received *Before* The Motion Was Filed**

Plaintiff initially objected to producing a number of documents.  However, despite

continuing to believe those documents were not subject to production-- and despite the fact that

defendant itself has to date refused to produce most of the relevant documents in the case and

the fact that defendant refused to produce a single document until plaintiff paid money for them

(although defendant has never offered to pay plaintiff's costs for sending documents to

defendant)--plaintiff agreed to produce them anyway.  This agreement, and the concurrent

burden of cost it placed on plaintiff, was something plaintiff accepted in light of this Court's

policy of encouraging negotiated resolutions of discovery disputes.

Accordingly, on September 6, 2010, plaintiff's counsel stated to defense counsel that

supplemental documents would be produced, obviating any need for a conference before that

production. (Exhibit 1, a copy of counsel's September 6, 2010 email).[7]  Plaintiff's counsel

---

7  It is odd that defendant, after claiming plaintiff "refused" to participate in a conference ( a claim that

intended to send these documents the following day, but personal illness intervened. However, she was able to send those documents to defense counsel by Friday, September 10, 2010, at 10:01 a.m. eastern time (Exhibit 2, a copy of the September 10, 2010 email forwarding the documents and further email communication between the two counsels regarding the documents that were just sent.) Plaintiff's counsel had received a spamwall notification that document request number 7 had been returned because of the spam & virus firewall at defense counsel's email location. Plaintiff's counsel resent document request number 7 to defense counsel at 10.39 am eastern time with a note stating,

> *"I am resending this attachment. Apparently, it did not go through."*

Less than five minutes later at 10.43 am eastern time defense counsel responded as follows in the email reproduced below.

**From:** Swann, Sally <sswann@oag.state.md.us>
**To:** 'kancvi@aol.com' <kancvi@aol.com>
**Subject:** RE: Undelivered Mail Returned to Sender
**Date:** Fri, Sep 10, 2010 10:43 am

Apparently the file is damaged. It cannot be opened.

Five and half hours after the initial document production and almost five hours after this email exchange, at 3:31 p.m. eastern time, defendant filed this motion. (Exhibit 3, copy of the Notice of Electronic Filing from the U.S. District Court of Maryland).

The documents plaintiff produced on the morning of September 10, 2010 included:

- 12 pages in response to Defendant's Request for Production (RFP) 6;

---

is obviously disingenous) asserts this supposed "refusal" allowed it to ignore the requirements of Local Rule 104-- when it previously sought to hide behind those same requirements despite its own refusal to abide by them and respond in a timely fashion to motions to compel. (See Docket Number 54).

7

- 21 pages of tax filings in response to RFP 7;

- 54 pages concerning Dr. Mezu's mortgage in response to RFP 8;

- 148 pages in response to RFP 9;

- 47 pages in response to RFP 10;

- 16 pages in response to RFP 11;

- 39 pages in response to RFP 12;

- 95 pages in response to RFP 13;

- 148 pages in response to RFP 16.

- There were no documents produced in response to RFPs 14 and 15 because none exist--these concerned expert disclosures, discussed below.

## II.   Defendant Seeks Sanctions For Failure To Make Expert Disclosures For Non-Existent Experts

Plaintiff disclosed to defendant that there were two physicians who had knowledge of Olachi's surgery, subsequent treatment, and subsequent condition.  These two were physicians who treated Olachi, Dr. Judy Huang, a neurosurgeon at Johns Hopkins University Hospital, and Dr. Raymond Nze.  They are experts, of course, in that they have medical knowledge beyond that of a layperson. (Def. Ex. A).  As plaintiff stated explicitly in the original document disclosing these persons, however, they are not now and never have been "expert witnesses" for plaintiff, nor are they consulting experts of any sort.  Accordingly, there are no disclosures to make about them.

### A.   Olachi's Treating Physicians Are Not Plaintiff's Expert Witnesses

As the original disclosure stated,  "*they have not been retained nor specially employed to*

8

*give expert testimony in this case*" nor were they "employees of plaintiff whose regular duties involved giving expert testimony...." (Def. Ex. A, page 2)(emphasis supplied).

To put it as simply as possible-- neither plaintiff, plaintiff's counsel, nor anyone acting on plaintiff's behalf has ever consulted with either Dr. Huang or Dr. Nze about giving an expert opinion in this case, either for use at trial or for use in any way in this litigation.  Both physicians have a great deal of information about the history of Olachi's condition, as they treated her; but neither is ever expected to render an opinion.  They are fact witnesses, pure and simple.

As one well-known treatise explains:

> Physician-witnesses may testify based on their activities as treating or consulting physicians or more generally about medical and scientific knowledge and its application to the issues in a case. In the former role, they may be characterized as "fact" witnesses, but they will also be applying medical expertise to a greater or lesser degree in assessing the significance of the patient's signs and symptoms and medical history, making a diagnosis, opining on proper treatment and prognosis, and the like.

33-SE 10 Moore's Federal Practice - Civil § II.  Given they have this expertise, it is only fair to disclose them as experts-- exactly as plaintiff did, see Def. Ex. A-- but of course since they do not render expert opinions there are no other disclosures that could be made.  *Patel v. Gayes*, 984 F.2d 214, 217 (7th Cir. 1993) (Fed. R. Civ. P. 26 focuses not on status of witness, but on substance of testimony); *Bucher v. Gainey Transp. Serv. of Ind., Inc*., 167 F.R.D. 387, 390 (M.D. Pa. 1996) (no disclosure of expert necessary because physician's opinion was based on diagnosis and treatment of patient).

Plaintiff has never sought to obtain opinions of any sort from either physician for use in this litigation, nor has plaintiff ever sought to obtain their testimony for trial or deposition.

9

Plaintiff stated that quite clearly in the document attached to defendant's motion as Exhibit A. The Court can see for itself in reading that document. Plaintiff has no expert witnesses. Accordingly, plaintiff has nothing to disclose-- no opinions, no records of consultations, nor anything else.

B.      **Neither of Olachi's Treating Physicians--Nor Any Physician--**
        **Could Offer a Relevant Expert Opinion**

Furthermore, the fact that defendant believes either physician could render an expert opinion relevant to this case, rather than simply give fact testimony about what they observed and what advice and recommendations they made in the fall of 2009, is still more evidence that defendant has failed to pay attention to the nature of this case. Neither of Olachi's treating physicians, Dr. Huang and Dr. Nze, could provide an expert opinion that would be relevant in any way **to** this action. There is no point in an expert medical opinion in an FMLA interference case at all. Dr. Mezu sought FMLA leave because physicians who were treating her daughter first decided that her daughter required emergency brain surgery, and then advised that her daughter needed a lengthy recovery from having portions of her brain operated on. These are *facts* that can be confirmed by asking both Dr. Huang and Dr. Nze. Whether they were correct; whether the surgery was the best treatment option, whether the advice given about Olachi's recovery was the best advice might be matters for expert medical *opinion*, but *these issues are not at stake in this litigation.*

Dr. Mezu, a college professor who teaches literature and English classes, is, like any other employee, entitled to rely on the advice of medical professionals in seeking FMLA leave. She was not required to employ some sort of expert to evaluate Olachi's doctors' advice before

10

seeking leave.  She also was entitled to rely on the medical certification they gave.   If MSU thought there was something unreliable about Dr. Huang's decisions to operate or any subsequent treatment and medical advice that was stated in Dr. Huang's certification, it had the right to seek second opinions-- but it chose not to.  It cannot now challenge what Dr. Huang certified.

To put it in the starkest terms possible--even if Dr. Huang's certification was 100% medically inaccurate, and even if Dr. Huang was wrong to operate on Olachi, and even if the medical professional were wrong to believe it takes months to recover from such an operation, and even if they were wrong to advise that Olachi needed someone to care for her-- none of that is relevant in any way.  Dr. Mezu was entitled to seek FMLA leave, trusting in the medical advice given, whether it was right or wrong.   Thus, there is no place for expert medical opinion in this case, as such opinion has no relevance to either plaintiff's claims nor any legally cognizable defense MSU might try to raise.

At the time Dr. Mezu obtained a medical certification from Dr. Huang, MSU had the opportunity to challenge its validity then, and obtain a second or even a third opinion.  29 U.S.C. § 2613(c).   Those opinions would have been final and binding.  *Id*. at subsection (d). Having chosen not to do so, MSU cannot be heard to now challenge the validity of the certification.

When the employer questions the soundness of the certification, the FMLA sets forth procedures for obtaining second, and third, opinions. It provides that "the employer *may* require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider" and, if the first and second judgments differ, that "the employer

11

may require, at the expense of the employer, that the employee obtain the opinion of a third health care provider[.]" 29 U.S.C. § 2613(c)(1), (d)(1) (emphasis added).  The final regulations contain substantially similar language. *See* 29 C.F.R. § 825.307(a)(2).  Courts have therefore held that an employer's failure to request a certification under subsection (a), or to challenge a certification provided thereunder, under subsection (c) and/or (d), estops it from challenging it thereafter by other means. *See, e.g., Thorson v. Gemini, Inc.,* 205 F.3d 370, 382 (8th Cir.), *cert. denied,* 531 U.S. 871, 148 L. Ed. 2d 117, 121 S. Ct. 172 (2000); *Washington v. Fort James Operating Co.,* 110 F. Supp. 2d 1325, 1333-34 (D.Or. 2000); *Miller v. AT&T,* 60 F. Supp. 2d 574, 580 (S.D.W.Va. 1999), *aff'd by* 250 F.3d 820 (4th Cir. 2001); *Sims v. Alameda-Contra Costa Transit Dist.,* 2 F. Supp. 2d 1253, 1261-62 (N.D. Cal. 1998) ("The statutory scheme is designed to have medical determinations made by health care providers, rather than courts.").

In any case, even if Drs. Huang and Nze could provide relevant expert testimony, plaintiff has not sought their opinions or sought to retain them in any way.  Defendant is aware of this fact, but has disingenuously used a failure to produce disclosures about these phantom experts who are not actually experts as an excuse to file the current motion.

As far as trying to probe what Dr. Huang meant in her certification, or other facts she knows, or facts Dr. Nze knows, of course MSU is free to depose them, as it would any other third  party who is a fact witness.  Just like it would be free, if this were a traffic accident negligence case, to seek the deposition of a man standing on a street corner who saw the traffic light turn green, it is free to seek to depose the two physicians who happened to have treated Olachi.  That is MSU's decision, and if it wants to hold those depositions, it is MSU's obligation to arrange them.

12

Indeed, MSU has chosen to depose them. Although it has never bothered to serve any notice of those depositions on plaintiff's counsel, defendant did send an email claiming to have arranged both physicians' depositions in October, 2010. MSU has every right to do so. Of course, if defense counsel adopts the same tactics in those depositions that she adopted in the depositions already taken it is quite likely the depositions will not shed much light. So far, defense counsel's method of taking depositions has involved attempting to attack and provoke the witness rather than elicit information, and asking questions for hours about mythical claims that do not exist in this case. However, plaintiff certainly has made no effort to stop the depositions.

### III.   Plaintiff Has Produced All Medical Records Within Her Control

Defendant also claims it has not been able to obtain "medical records." Defendant appears deliberately vague concerning which medical records it seeks to obtain. To the extent defendant suggests that it does not have plaintiff's records, this is entirely untrue. Indeed, defendant read from these records at Dr. Mezu's deposition, see transcript of deposition of Dr. Rose Ure Mezu, at page 108, lines 16-21 (hereinafter, the convention for reference will be "Mezu 108:16-21.") These records were those of Dr. Mezu's illness arising after she was forced to teach in an unheated basement classroom.

Despite having all of Dr. Mezu's records from her physicians here in the United States, defendant contends

> ...by refusing to disclose complete medical records from her physician in Nigeria, Plaintiff has deprived Defendant of the right to discover the facts about her medical condition when she was in Nigeria before returning to the United States and Morgan in Spring 2009. Shortly after Plaintiff returned to the United States, she suffered a serious illness which she contends is the fault of Morgan.

13

(Defendant's memorandum at 21). In keeping with what is clearly a pattern, that paragraph contains several distortions of the allegations, one critical falsehood and one more example of defendant's inexplicable decision to defend against non-existent claims never made in the Amended Complaint while making little attempt to defend the claims that actually were made.

First, the illness Dr. Mezu suffered-- including falling into a coma-- occurred in the spring of 2008, months *before* her mother's funeral. Thus, her condition while she was in Nigeria is in no way relevant to what caused that prior event.

Second, though Dr. Mezu on a personal level feels the stress MSU put her through contributed to her illness, there is *no claim in the Amended Complaint to that effect.* The Amended Complaint describes the events from November 2008 through the summer of 2009 in paragraphs ¶¶ 41-60 under the heading "Recent Hostile Actions Cognizable Under Title VII." These are the earliest events described as relevant to her Title VII claims. There is no mention of Dr. Mezu's illness in the spring of 2008 there.

Third, Dr. Mezu has produced every medical record to which she has access. This included a doctor's note from a physician in Nigeria. There are no other records from Nigeria to which she has access. Nigeria is, of course, a different country on a different continent with a very different set of laws and practices concerning medical records, with a medical system in a very different level of development than that found in the United States. Dr. Mezu has no other records from Nigeria, and is unable to determine if any even exist.

Finally, again-- nothing in the Amended Complaint makes any allegations about Dr. Mezu becoming ill after she returned from Nigeria.

### A.   Defendant Has No Right to Ask Dr. Mezu to Produce a Third Party's Medical Records and Dr. Mezu Does Not Have a Right nor the Ability to Produce Them

It appears that the medical records defendant primarily **demands** are not those belonging to Dr. Mezu, but records belonging to her adult daughter, Olachi Mezu.  Olachi is not a party to this litigation, the records belong to her and do not belong to Dr. Mezu, and Dr. Mezu has no right to produce them or order others to do so.  As much as Dr. Mezu has tried to be cooperative in discovery (unlike defendant, who appears to believe it has no obligations, even to respond to motions to compel for its failure to produce most of the relevant information in this case), Dr. Mezu can only produce what is in her possession and what she has a right to produce.  These records do not fall into that category.

### 1.   The Medical Records In Question Belong to a Third Party

Dr. Mezu cannot do the impossible, and will not, as defendant demands, knowingly violate federal law (specifically, the Health Information Portability and Accountability Act or "HIPAA.")   The medical records in question do not belong to Dr. Mezu but belong to another person, Olachi, who is not a party to this litigation.  Furthermore, they are in the possession of Olachi's health care providers, who are forbidden to disclose them to anyone but Olachi Mezu without her permission.

The HIPAA Privacy Rule regulates the use and disclosure of certain information held by "covered entities" (generally, health care clearinghouses, employer sponsored health plans, health insurers, and medical service providers that engage in certain transactions.)  It establishes regulations for the use and disclosure of Protected Health Information (PHI).  PHI is any information held by a covered entity which concerns health status, provision of health care,

or payment for health care that can be linked to an individual.  45 C.F.R. 164.501.  This is interpreted rather broadly and includes any part of an individual's medical record or payment history.

A covered entity-such as Johns Hopkins University Hospital, where Olachi received her emergency brain surgery, or Dr. Huang, her neurosurgeon-- may disclose PHI to facilitate treatment, payment, or health care operations, 45 C.F.R. 164.524(a)(1)(ii), or if the covered entity has obtained authorization from the individual.  45 C.F.R. 164.524(a)(1)(iv).  However, when a covered entity discloses any PHI, it must make a reasonable effort to disclose only the minimum necessary information required to achieve its purpose. 45 C.F.R. 164.524(b).

The records MSU seeks belong to Olachi, not Dr. Mezu.  They are in the control of Olachi's doctors and hospitals and other health care providers.  If defendant wants to see them, defendant will have to seek them from those doctors and hospitals and other health care providers.  Of course, those health care providers will refuse because the request seeks information the law *forbids them to disclose.*  These records belong to Olachi Mezu.  Olachi is not a party to this action and MSU has no right to see them.

The records, moreover, are entirely irrelevant, no matter what they contain.  Even if the records revealed the doctors all were engaged in a huge practical joke-- Johns Hopkins' neurosurgical team all got together and decided to cut Olachi's skull open simply on a lark--the issue is not what the medical records reveal, but what these physicians told Dr. Mezu about Olachi's condition and her needs, which led Dr. Mezu to seek FMLA leave.

16

## 2. That Third Party's Medical Records Have No Relevance to the FMLA Claim

In fact, though, none of Olachi's medical records are even relevant.  As the Department

of Labor explains:

> Employers may require that an employee's request for leave due to a serious health condition affecting the employee or a covered family member be supported by a certification from a health care provider.  *An employer may require second or third medical opinions (at the employer's expense)* and periodic recertification of a serious health condition.  An employer may use a health care provider, a human resource professional, a leave administrator, or a management official – but not the employee's direct supervisor – to authenticate or clarify a medical certification of a serious health condition.

See <http://www.dol.gov/whd/regs/compliance/whdfs28.htm.>  If MSU had doubts about

the reliability--either the honesty, accuracy or expertise shown-- in Dr. Huang's medical

certification, it could have sought another opinion.  As Section 103(c) and (d) of the

FMLA provides that:

> (c)(1) IN GENERAL.--*In any case in which the employer has reason to doubt the validity of the certification* provided under subsection (a) for leave under subparagraph (C) or (D) of section 102(a)(1), *the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider* designated or approved by the employer concerning any information certified under subsection (b) for such leave.
>
> (2) LIMITATION.--A health care provider designated or approved under paragraph (1) shall not be employed on a regular basis by the employer.
>
> (d) RESOLUTION OF CONFLICTING OPINIONS.--
>
> (1) IN GENERAL.--*In any case in which the second opinion described in subsection (c) differs from the opinion in the original certification provided under subsection (a), the employer may require, at the expense of the employer, that the employee obtain the opinion of a third health care provider* designated or approved jointly by the employer and the employee concerning the information certified under subsection (b).
>
> (2) FINALITY.--*The opinion of the third health care provider* concerning the information certified under subsection (b) s*hall be considered to be final and shall be binding* on the employer and the employee.

17

29 U.S.C. § 2613 (Emphasis supplied).  This procedure allows questions of the certification's validity to be resolved at time the leave is sought-- not a year later, after the employee already relied on a physician's advice that leave was needed.  MSU chose not to follow that procedure.  It cannot now question the validity of the only certification ever provided.

Dr. Mezu was advised by physicians that her daughter, after being subjected to emergency brain surgery, needed someone to care for her for some months.  Dr. Mezu is not a physician.  She followed the medical advice she was given.  Even if it were later proved wrong that Olachi needed care following, the information she had and which she shared with MSU was more than sufficient to justify FMLA leave.

**IV.    Defendant Cannot Seek Sanctions Simply Because Its Counsel
Exhibited Bad Manners and Poor Interrogation Skills**

Defendant also seeks sanctions because of its subjective characterization of Dr.Mezu as "evasive" during her deposition.  Reviewing the transcript, it appears a more accurate analysis of the deposition questions and answers suggests that to the extent the deposition was not fruitful, the cause was not Dr. Mezu but rather defense counsel's rather clumsy questioning.  Defense counsel seemed to place a higher premium on provocation and aggression than on eliciting information.  Moreover, she wasted hours on matters of no relevance to the claims brought in the complaint, apparently focusing on claims that do not exist rather than the ones that do.

**A.    Defense Counsel Engaged in Abusive
Tactics During the Depositions**

During Dr. Mezu's deposition, defense counsel engaged in interrogation tactics suited for

18

provocation and irritation, not for illumination.   At times, it appears the questioning was intended to prevent the elicitation of information, rather than accomplishing that goal.

Certainly, the goal of the deposition did not appear to be to develop defenses to the claims in the Amended Complaint, or indeed to actually obtain information about the events relevant to the Amended Complaint.  The central events in this case-- those that give rise to the two FMLA counts, and which are important to the remaining count under Title VII, began when Dr. Mezu's daughter, Olachi, had emergency brain surgery in August of 2009, and continued through the time Dr. Mezu returned from leave on December 4, 2009, until mid-January 2010 when defendant finally restored Dr. Mezu to the payroll.  As noted in the accompanying analysis (the last four pages of the Appendix) Defense counsel spent less than a third of the deposition discussing anything related to these events (1558 of 4899 lines of the deposition).

Although the Amended Complaint's only allegation about Dr. Mezu's trip to attend her mother's funeral was that Dr. Mezu was given the wrong forms for leave, creating bureaucratic hassles, defense counsel spent more time on her trip to take care of that funeral (1704 lines) than on the relevant events of the fall of 2009 through January 2010.   The Amended Complaint's allegations concerning that trip largely focused on the hostile actions arising after Dr. Mezu returned (paragraphs 46-60), defense counsel spent nearly no time on these.  There is no allegation whatsoever in the Amended Complaint about how MSU handled Dr. Mezu's illness in 2008-- but defense counsel spent more time on that topic (667 lines) than she did on the topic of Dr. Mezu's actual request for leave which gave rise to this action (612 lines).

 In addition to spending the bulk of the deposition on irrelevant issues, one of defense

19

counsel's most problematic, and frequently used techniques was to question Dr. Mezu about what Dr. Mezu had written in a document some lengthy time ago, without allowing Dr. Mezu to see the document or even bothering to read that document to Dr. Mezu.  Examples abound:

When asking Dr. Mezu about a form she filled out for leave to go to Nigeria in 2008 to bury her mother (which was an FMLA leave request, as she testified, because it was what was given her)[8], defense counsel refused to show Dr. Mezu the form, and instead asked:

> Q.    So, when you filled out the form, did you read the questions?
> A.    (No response.)
> Q.    Did you read the questions that were on the
>       form? I will find it in a minute. Are you going to
>       answer the question?
> A.    I don't have the form before me.

(43:15-21).  Defense counsel asked questions[9] in the abstract about a form Dr. Mezu had filled out nearly two years earlier without allowing Dr. Mezu to see it.  This technique, apparently intended to create more heat than light, was repeated frequently throughout the long day.

> Q    So, did you consult the Academic Calendar to check on that?
> A    I believe if you check your files on the letter I wrote to Doctor Hubbard, I
>      put in there [the] class periods, when they were to meet, whoever [was] to
>      cover the classes. So, check your records.
> Q    My question is: Did you check the Academic Calendar to see how many
>      weeks were left and how many class periods were left?
> A     I checked.
> Q    And the result of that was?
> A    What I wrote in the document, which I have given to you.

---

8  Defense counsel spent a substantial amount of time trying to establish that going to her mother's funeral was not properly an FMLA request, and plaintiff should have known MSU had given her the wrong form.  Why defendant spent so much time (about half the deposition) on that topic is mystifying, as there is no claim in the complaint that MSU's failure to grant FMLA leave to attend the funeral was an interference with her FMLA rights.  The contention in the complaint is that, as part of the pattern of hostile behavior to her, MSU gave her the wrong form and made it difficult to obtain bereavement leave-- relevant to her two retaliation claims only.  There has never been a contention in the complaint that she should have had FMLA leave to bury her mother.

9  Irrelevant questions, too.  See preceding footnote.

20

Q        It is a little ambiguous. That is why I am trying to find out.
A        If you refer to the documents --
Q        I am here to ask questions.
A        I don't remember.

30:11 to 31:7.  In other words, counsel asked Dr. Mezu about events from two years before; Dr. Mezu told counsel that she had written contemporaneous accounts of those events at the time and these were reliable; and counsel refused to refer to them.  Even when counsel made the excuse she found these documents "ambiguous," she refused to show them to Dr. Mezu to ask her to clarify them.  If she had wanted information, she would have proceeded that way; instead, it appeared she simply wanted to claim her authority to be "here to ask questions."

Counsel also engaged in petty disputes with the witness.  Thus, for example, this exchange:

Q        Do you remember what the diagnosis was?
A        There was no diagnosis. I was sick. I
         thought it was the flu.
Q        The diagnosis says, "A viral illness."
A        I had the flu.
Q        It didn't say flu. It didn't say flu.

108:16-21.  This exchange established that Dr. Mezu's physician said she had a viral illness-- which, of course, is what influenza is, a viral illness-- but of course, most laypeople use the term "flu" for much more than influenza, but almost any serious viral illness with what are commonly called "flu-like"symptoms.  This silly exchange was par for the course in the deposition-- and as was also par for the course, it had no relevance to any issue in the case at all. These events took place in the spring of 2008, and are not events related to the claims made in the Amended Complaint.

Even worse than her harassing tactics, though, was the inexplicable and confusing

21

decision by defendant to invent claims that do not exist in the Amended Complaint, and spent

an extraordinary amount of time trying to defend against them, and asking questions about

these non-existent claims that baffled plaintiff and her counsel.

### B.      Defendant's Inquiry Into the Mythical "Spring 2008" Claims

At page 8 of defendant's memorandum, defense counsel stated, "Plaintiff's counsel

would not allow Plaintiff to answer questions about the basis of her contention that Morgan

violated her FMLA rights in Spring 2008."  There was no such claim made in the Amended

Complaint.  The questions on that point were therefore not only irrelevant, but confusing, and

apparently intended to elicit hypothetical legal conclusions about claims Dr. Mezu might have

made in some other version of reality.

The FMLA interference claim, stated in Count II of the Amended Complaint (a copy of

the Amended Complaint is attached hereto as Exhibit 4 for the Court's reference) is short

enough that the entire set of operative paragraphs can be quoted here:

> 97.      Dr. Mezu was entitled to leave under the FMLA for the period she sought to assist her daughter following her daughter's life-threatening brain surgery.
>
> 98.      Dr. Mezu gave sufficient notice of her intent to take FMLA leave.
>
> 99.      Morgan State failed to respond in a timely fashion to Dr. Mezu's FMLA leave request.
>
> 100.     Furthermore, Morgan State denied Dr. Mezu of her right to leave under the FMLA despite her entitlement to such leave.

Amended Complaint, Count II.   Perhaps defendant overlooked this count, which refers to

events that began in August 2009 and ran through January 2010-- in fact, a narrative of events

that did not end until MSU faced default judgment and a preliminary injunction hearing in this

case, at which time it "remembered" to start paying Dr. Mezu again.  It has nothing to do with

22

the spring of 2008.

### C.   Defendant's Citation of the Record is Incomplete and Misleading

In its memorandum, defendant produced several examples of what it purports to have been improper behavior during the deposition.  Not surprisingly, defendant was selective in quotation, making sure relevant testimony was not mentioned, as that testimony renders defendant's charges hollow.  Each of these allegations is addressed in specific detail in the accompanying appendix, with appropriate but lengthy quotations from the record.

### D.   Defendant Sought to Invade the Privacy of  Non-parties to Seek Irrelevant Information

A perusal of the deposition transcript shows that matters became quite heated when defense counsel pushed hard, to find out the personal information about Dr. Mezu's children, none of whom are parties to this action.  There is no doubt that Dr. Mezu refused to answer these questions.  She found them morally objectionable, and she still continues to do so.  To answer would be to provide private information about people who are not parties to this action and are not witnesses to anything in this case, and who did not ask to be dragged into it.  These were very invasive and improper questions.

One set of questions appeared to be about Olachi Mezu's residence address (questions that brought visions of defense counsel harassing her fragile daughter into Dr. Mezu's mind), and repeated efforts to learn about her husband.  Defense counsel neglects to inform the Court, that she knows that Olachi and her husband are not living together,[10] yet she suggests that Dr.

---

10      *See* Dr. Sebastian Mezu's deposition, at 9:
   **7** Q Where does he live?
   **8** A I don't know.
   **9** Q Does he live with your daughter?

Mezu might not have needed to take FMLA leave because possibly he could have taken care of Olachi instead.  Even if that were true, however, it would be irrelevant.  The FMLA allows a parent to take time to care for a seriously injured or ill adult child, and it does not in any way require that parent to prove no other person could do it instead.  Thus, apart from creating hostility, these questions were useless.

## IV.     Meanwhile, Defendant Continues To Ignore Its Own Discovery Obligations

Meanwhile, defendant has yet to come close to complying with its discovery obligations, despite facing a currently pending motion to compel that should be considered unopposed, as defendant has never responded to that motion (though it has been pending for well over a month).  Defendant has, since the motion was filed, produced those documents it always promised it would produce (and stated it would bill plaintiff for them).  It has not, however, budged one bit from the extensive and unfounded objections which are the topic of the motion to compel.  It also, by the way, despite promising months ago to produce a privilege log , attached to the motion to compel as Exhibit 7, has not done so.  Given that defendant contends all the documents that show its differential treatment of plaintiff and other African-born employees as opposed to other MSU employees are privileged-- critically relevant to understand the context for the Title VII retaliation claim-- this privilege log is not a mere formality, but the best way to establish how truly recalcitrant defendant has been in this case.

### CONCLUSION

.      For all the reasons stated above, plaintiff respectfully requests this Honorable Court to deny defendant's motion for sanction in its entirety.

---

**10** A No.

Respectfully submitted,

Dated: September 21, 2010                     /S/ C. Valerie Ibe, Esq.

Law Offices of C. Valerie Ibe,

A  Professional L aw Corporation

23614 Nadir Street

West Hills, CA 91304
Telephone: 818-346-8777
Email:Kancvi@aol.com
Bar ID: 94234
Counsel for Plaintiff, Rose Ure Mezu

/S/ John M. Singleton, Esq.
Singleton Law Group
400 Redland Court, Suite 107
Owings Mills, MD 21117
Telephone: 410-902-0073
Fax: 410-902-7372
Email:jmsingleton@sgt-law.com
Bar ID: 02275
Counsel for Plaintiff, Rose Ure Mezu

25

**CERTIFICATE OF SERVICE**
**All Case Participants Are CM/ECF Participants**

I hereby certify that on September 21, 2010, I electronically filed the foregoing and all attachments with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Sally Lotz Swann    sswann@oag.state.md.us,

/S/ C. Valerie Ibe, Esq.
Law Offices of C. Valerie Ibe,

A  Professional L aw Corporation

23614 Nadir Street

West Hills, CA 91304

Telephone: 818-346-8777
Email:Kancvi@aol.com
Bar ID: 94234
Counsel for Plaintiff, Rose Ure Mezu

/S/ John M. Singleton, Esq.
 Singleton Law Group
 400 Redland Court, Suite 107
 Owings Mills, MD 21117
 Telephone: 410-902-0073
 Fax: 410-902-7372
 Email:jmsingleton@sgt-law.com
 Bar ID: 02275
 Counsel for Plaintiff, Rose Ure Mezu