# EXHIBIT 4 – AMENDED COMPLAINT

Case 1:09-cv-02855-WMN   Document 73-4   Filed 09/21/10   Page 1 of 24

Case 1:09-cv-02855-WMN   Document 41   Filed 06/08/10   Page 1 of 23

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ROSE URE MEZU | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. WMN-09-2855 |
| | : | |
| MORGAN STATE UNIVERSITY, | : | |
| and | : | |
| ARMADA  W. GRANT, | : | |
| in her personal capacity and | : | |
| as Director, Human Resources/Payroll for | : | |
| Morgan State University, | : | |
| and | : | |
| DOLAN HUBBARD, | : | |
| in his personal capacity and | : | |
| as Chair,  Department of English | | |
| : and Language Arts, | : | |
| Morgan State University, | : | |
| Defendants. | : | |

**COMPLAINT**

NOW COMES plaintiff, Rose Ure Mezu, Ph.D., (sometimes hereinafter "Dr. Mezu" or "Plaintiff") bringing this action against Morgan State University (hereinafter "Morgan State") Armada W. Grant (sometimes hereinafter "Grant"), and Dolan Hubbard, Ph.D., (sometimes hereinafter, "Dr. Hubbard")(collectively, "Defendants"), and in support thereof alleges:

**Background Statement**

The history of discrimination against plaintiff, Dr. Rose Ure Mezu, her attempts to have that discrimination addressed and remedied, and the retaliation against her for making those efforts, goes back several years. For reasons of providing necessary context, some of those events, though not the basis of the current lawsuit, are described below.   As background to the

allegations which are the basis of this current lawsuit, it is necessary to describe a pattern of harassment and retaliation going back more than a decade. The actions below violate both Title VII and the Family and Medical Leave Act (FMLA).

## ALLEGATIONS

1. Plaintiff is a resident of Pikesville in the Baltimore County of the State of Maryland, within the boundaries of the District of Maryland.

2. Morgan State is a university and employs more than five hundred and one people and does business as Morgan State University at the following location: Morgan State University, 1700 Cold Spring Lane, Baltimore, Maryland 21251.

3. Grant is the Director of the Department of Human Resources/Payroll, employed by Morgan State University as the Director of Human Resources and supervisor of the department and does business at the following location: 100Carter-Grant-Wilson Building, 1700 E. Cold Spring Lane, Baltimore, Maryland 21251.

4. Dr. Hubbard is the Chairperson of the Department of English and Language Arts, for Morgan State University and is employed by Morgan State University as chairperson and supervisor of the Department and does business at the following location: Department of English & Language Arts, Holmes Hall, Room 202, Morgan State University, 1700 Cold Spring Lane, Baltimore, Maryland 21251.

5. This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for employment discrimination on the basis of race, color, religion, sex, or national origin. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000e(5).

2

6. This action is also brought pursuant to the Family and Medical Leave Act,

## I. **Allegations Common to All Counts**

7. Plaintiff, Rose Ure Mezu, Ph.D., was initially hired on January 19, 1993 to teach at Morgan State University, and was appointed Assistant Professor of English later that year.

8. Her record of accomplishment there has been distinguished, consistently ranking first in the department in student evaluations.

9. Dr. Mezu also is "one of the Department of English and Language Arts' most productive writers and her energy for new knowledge translates into effective leadership for students…" as stated in a letter from a former professor at Morgan State, Dr. Carolyn Maun.

10. Dr. Mezu prepared conferences for the school, including conferences such as "Writers of African Descent Speak" which attracted over 500 participants from several different countries.

11. Dr. Mezu inaugurated the *Lyceum Lecture Series* and the *Writers Forum*, for both of which she received commendations from the university.

12. Dr. Mezu also was appointed the Coordinator of the *Black Creativity Conference.*

13. Her problems at Morgan State University, however, can be seen to have begun, in retrospect, with the appointment of Dr. Dolan Hubbard as her departmental chairman in 1998.

14. Dr. Hubbard made numerous statements over the course of the past decade that reveal his strong antipathy and bias against Dr. Mezu's Nigerian and Igbo ethnic origin and the value of her work, which is focused on Nigerian authors.

15. Despite the fact that Nigeria is the third-largest English speaking country in the world, after India and the United States, and one of the most widely-respected novelists in the world today is a Nigerian, Chinua Achebe, a winner of the Man Booker International Prize, and who is

the subject of Dr. Mezu's book *Chinua Achebe:  The Man and His Works*, and another Nigerian, Wole Soyinka, has won the Nobel Prize for Literature, Dr. Hubbard denigrated Dr. Mezu's academic work for the sole reason that it was published in Nigeria.

16.    Dr. Hubbard, despite his own unsuccessful effort to obtain a teaching appointment in Nigeria, has made repeated derogatory remarks about Nigeria academics.

17.    Dr. Hubbard has, for more than the past decade, subjected Dr. Mezu to a constant stream of harassment, as will be detailed below.  Although most of these events occurred outside the statute of limitations, they exhibit the pattern of discriminatory behavior, and evidence the discriminatory behavior behind that behavior, both of which continue to the date of this complaint.

a)  For instance, in 2001,when Dr. Mezu notified her department that she might be one day late returning from the spring break because she was with her daughter, who was undergoing a difficult pregnancy in which she was on bed rest, Dr. Hubbard suggested she had abdicated her responsibilities and sought a conference with Dean, Academic Vice President, and Director of Human Resources to discuss her alleged "abdication" of her responsibilities, while other faculty members in similar situations that did not share Dr. Mezu's Nigerian background were treated with more sympathy and understanding.

b)  Dr. Hubbard criticized Dr. Mezu for teaching at The Johns Hopkins Universisty, although other faculty members including the Dean of the College of Liberal Arts did so as well and knew and approved of Dr. Mezu's teaching there.

c)  On a number of occasions, when Dr. Mezu required time for sick leave, Dr. Hubbard challenged her use of sick leave, questioning her integrity and honesty.

4

d) Dr. Hubbard and the university exhibited repeated unreasonable adverse reactions over the course of all the years since Dr. Hubbard became chairman of the English Department to personal and family emergencies necessitating brief absences from campus while other, similarly situated faculty members did not experience similar hostile adverse reactions.

e) Dr. Hubbard has refused to fund Dr. Mezu's attendance at various professional conferences though other faculty members, not of Nigerian nationality, were provided with funding.

f) Dr. Hubbard attempted to cancel the Writers of African Descent Conference Dr. Mezu had created, and then, after failing to do so and seeing the conference was a success, Dr. Hubbard took over the conference himself.

g) Dr. Hubbard kept Dr. Mezu from organizing further conferences.

h) Dr. Hubbard has consistently over the years made unfounded derogatory comments about Dr. Mezu's commitment to her teaching responsibilities and her students to other members of the university's administration.

i) The university has responded by providing significantly less pay to Dr. Mezu than to other, similarly situated associate professors of her experience.

j) Dr. Mezu consistently has been required to teach more class hours than the Faculty Manual states are a "full load," a condition called "teaching overload." Contrary to university guidelines, requiring extra compensation for teaching overloads, Dr. Mezu did not receive any extra compensation.

18. Dr. Mezu has reported these harassing actions and discriminatory attitudes to Dr. Hubbard's superiors, including the university's Director of Human Resources, Armada Grant,

the Director of Student Activities, and Dean Burney Hollis.

19.     Despite her reports and requests for assistance in ending the harassment, the harassment has continued and intensified.

20.     In 2000, Dr. Mezu first applied for promotion to full professor, which was denied despite the recommendation of her departmental peers that she be promoted.

21.     Dr. Mezu then filed charges with the EEOC on August 18, 2001.  After receiving a right-to-sue letter from the EEOC, Dr. Mezu brought her first lawsuit against her employer.

22.     That lawsuit (the "First Action"), docketed at Civil Action Number 02-CV-03713-JFM in the District of Maryland,  alleged harassment and wage discrimination against the university and the department chair, Dolan Hubbard, for violation of Title VII, Equal Pay Act (EPA), and Family Medical Leave Act (FMLA).

23.     The First Action was dismissed because the court read her claims under the EPA to be based on her national origin, and the EPA only addressed gender-based discrimination, and because the court found her claims that she was improperly denied a promotion untimely.  The court did not rule on the merit of the factual allegations.

24.     After Dr. Mezu filed the First Action against the university and Dr. Hubbard, the university and Dr. Hubbard retaliated by increasing their harassment and discriminatory treatment of her including the refusal to process her most recent application for promotion to full Professor in accordance with the University, *Appointments, Promotions and Tenure (APT) Policy.*.

25.     For instance, one among many instances of Dr. Hubbard's efforts to make working conditions for Dr. Mezu intolerable occurred in the fall semester of 2005.  At that time, Dr.

6

Mezu's Ph.D. courses, in which she taught doctoral candidates, normally scheduled for Wednesday from 8:00 to 10:00 p.m., were rescheduled for Friday evenings, at a time when the university was experiencing muggings on weekend evenings. No other English Department courses were ever scheduled for such a time.

26. When Dr. Mezu sought to return the class time to Wednesday, Dr. Hubbard instead cancelled the course and re-assigned Dr. Mezu to teach a freshman introductory course instead, a class normally taught by graduate students.

27. After trying, again, to obtain a promotion, and after finally determining in the fall of 2006 that she would be denied a promotion without even providing her with the opportunity to appeal that denial using normal administrative procedures the university's own rules provided, Dr. Mezu, filed another charge with the Equal Employment Opportunity Commission ("EEOC") against her employer, Morgan State University, and her departmental chair and immediate supervisor, Dr. Dolan Hubbard, on March 25, 2007 for violation of Title XVII and the Equal Pay Act, alleging discriminatory denial of a promotion to full professor on the basis of her race and national origin, harassment on the basis of her race and national and ethnic Igbo origin and retaliation against her because she filed charges with the EEOC.

28. Once again, the university and Dr. Hubbard intensified their harassment and discriminatory treatment of Dr. Mezu.

29. One act of retaliation and discrimination especially stood out, as the university violated Dr. Mezu's privacy and treated her in a humiliating fashion during a sabbatical she took in the fall of 2007, treating her quite differently from any other faculty member who took such a sabbatical.

30.     Dr. Mezu took the aforementioned sabbatical during the fall semester of 2007.  Other faculty members in her department, including but not limited to Professor Meena Khorana and Associate Professor Linda Carter, had previously taken sabbaticals, and during their sabbaticals, they retained their personal offices. These were not of Igbo ethnic or Nigerian origin.

31.     Despite the fact that faculty members on sabbatical normally keep their offices, the university took away Dr. Mezu's office with no prior notice to Dr. Mezu before she left for sabbatical that her office would be taken from her during her sabbatical.

32.     During Dr. Mezu's sabbatical, the university reassigned her office to a graduate student (not even a tenured or tenure-track faculty member). The office contained Dr. Mezu's personal belongings and her privileged communications with her attorneys and the EEOC.

33.     During her absence, Dr. Mezu's office computer was tampered with and various files and documents irretrievably lost.  Despite repeaed requests, the University has refused to replace up till now Dr. Mezu's computer damaged during her sabbatical.

34.     When Dr. Mezu returned from that sabbatical, the university sought to move her office away from the English Department to a complex in another building that was not even part of the College of Liberal Arts complex.

35.     On May 30, 2008, the EEOC issued a right-to-sue letter to Dr. Mezu.  She then filed her complaint in the United States District Court for the District of Maryland, Northern Division, on July 18, 2008, docketed at Civil Action Number No. 08-C-1867WDQ, and amended that complaint on November 14, 2008 (the Second Action).

36.     The trial court in the Second Action selected a date midway through the promotion process as the date on which Dr. Mezu was denied her promotion, although Dr. Mezu herself did

8

not believe that final decision was made until, at the very least, several months later, and the trial court dismissed the complaint as untimely, without ruling on the substantive merits of her factual allegations.

37. Dr. Mezu appealed that decision, and her request for a panel rehearing on that matter remains pending

**II.     Recent Hostile Actions Cognizable Under Title VII**

38. During the pendency of her second action in the District Court and the Court of Appeals, Morgan State engaged in a series of adverse employment actions against Dr. Mezu, leading her to file another charge with the EEOC on July 10, 2009.

39. The EEOC issued Dr. Mezu a right to sue letter on August 6, 2009.

These adverse employment actions were motivated both by discriminatory animus against Dr. Mezu, a Nigerian-born woman of African descent, and with the intent to retaliate against Dr. Mezu for her exercise of her rights in filing complaints concerning the discriminatory actions taken against her.

40. The actions created a hostile and difficult working environment, one that is selectively applied to Dr. Mezu alone, and which have created an intimidating, hostile, or offensive working environment.

41. On November 6, 2008, Mrs. Ezinne Mama Bessie Okeke, Dr. Mezu's mother, passed away in her home in Nigeria.

42. Dr. Mezu made plans to go home to Nigeria for her mother's funeral.  She intended to leave on Saturday, November 22, 2008.

43.     Dr. Mezu spoke to the Human Resources Department about her mother's funeral. She was given forms to fill out by that office for bereavement leave. The form she filled out was a Request for Family and Medical Leave, dated November 18, 2008.

44.     At that time, she had two courses, one of which had three class sessions remaining in the semester and one only two sessions. She arranged for a faculty member to cover each of those classes, prepared assignments, and prepared the final examination and made plans for distribution of the examination which she would grade, and which grades she would report to the university.

45.     Dr. Mezu met with Dr. Hubbard on November 19, 2008 to inform him of her plans to attend her mother's funeral.

46.     His response was to write an email threatening Dr. Mezu with the "consequence" of an "unauthorized absence," in an email dated November 19, 2008.

47.     On November 25, 2008, Morgan State's Human Resources Director, Armada Grant, sent a letter to Dr. Mezu stating that she burial of a parent was not a basis for which leave could be granted under the Family and Medical Leave Act (FMLA) and thus her request for such leave was denied. However, Grant stated Dr. Mezu had the right to apply for "sick-bereavement leave." Grant did not explain why she initially gave Dr. Mezu a FMLA form to fill out rather than allowing Dr. Mezu to immediately begin the process of seeking "sick-bereavement" leave, and instead requested she fill out the wrong forms, thus delaying Dr. Mezu's application for "sick-bereavement" leave.

10

48.     On December 8, 2008, following Grant's instructions, Dr. Mezu replied by applying for "sick-bereavement" time to be charged to her leave.  Up till today, the University has neither granted nor denied this application for "sick-bereavement" leave.

49.     While in Nigeria for the funeral of her mother, Dr. Mezu received further communications from Dr. Hubbard suggesting that her attendance at the funeral during the winter break while no classes were scheduled was a form of misconduct for which Dr. Mezu could be punished; although no other members of the department were threatened for visiting family members over the Christmas holidays many of them celebrated.

50.     While in Nigeria, Dr. Mezu herself became ill and was advised not to travel, thus delaying her return to campus so that she missed the first day of classes in January.  She informed the university and Dr. Hubbard of her delay, and only missed one day.

51.     From the time Dr. Mezu returned from attending her mother's funeral, Dr. Hubbard has demanded a close review of her time sheets, and on several occasions refused to sign those time sheets, falsely claiming they were inaccurate.

52.     Dr. Hubbard has not engaged in such close supervision of other faculty nor challenged their veracity.

53.     Dr. Hubbard has demanded that Dr. Mezu's time sheets mark her "absent" during official university holiday, as well as during the winter break.

54.     Dr. Hubbard has not attempted to report other faculty as absent for not being on campus during Christmas.

55.    Throughout the early months of 2009, Dr. Hubbard made references to Dr. Mezu concerning "your pattern of absences" and told her he had instructed her absences to be reported to him, although no such close supervision of other faculty was ever threatened or undertaken.

56.    Throughout the early months of 2009, Dr. Hubbard sought out Dr. Mezu's students to prompt them to make complaints against Dr. Mezu.

57.    Dr. Hubbard did not seek out students from other faculty in this same way.

58.    Throughout 2008 and 2009, Dr. Hubbard has, on a weekly basis, threatened Dr. Mezu with discipline or termination, and demanded her presence at meetings during her summer vacation, specifically stating that she had to attend meetings on both May 19 and May 29, 2009 or else her "failure to appear will be regarded as insubordination, and I will take appropriate action to address your failure to appear."

59.    Dr. Hubbard has not threatened other faculty this way or demanded to control their time in such a way.

60.    Dr. Mezu has reported Dr. Hubbard's harassing behavior to the Dean and the Department of Human Services, to no avail.

61.    In August of 2009, Dr. Mezu's daughter suffered subarachnoid hemorrhage following a sudden cerebral aneurysm  that required her to be airlifted from an emergency room at a New Jersey hospital to the Johns Hopkins neurosurgery ward for emergency brain surgery lasting seven hours.

62.    On August 13, 2009, Dr. Mezu applied for leave under the Family and Medical Leave to care for her daughter.  The leave she requested was for the period August 31, 2009 until October 2, 2009.

63.     In furtherance of that request, Dr. Judy Huang, M.D., provided Morgan State University with the information that Olachi Mezu, Dr. Mezu's daughter, suffered a "subarachnoid hemorrhage-cerebral aneurysm," meaning heavy or uncontrolled bleeding under the membrane protecting the brain, with a permanent abnormal blood-filled dilation of a blood vessel in the brain, according to Merriam Webster's Medical Dictionary.

64.     Because of her daughter's brain surgery, and during the summer break when no classes were scheduled, on August 17, 2009, Dr. Mezu took one day off from work, after submitting a physician's note to the university, in order to be with her daughter.

65.     Dolan Hubbard, acting on behalf of Morgan State University, threatened to terminate Dr. Mezu for missing that day to be with her daughter, even though there were no classes in session, in a letter dated August 17, 2009; in that letter, he demanded Dr. Mezu appear at a meeting he had scheduled, with failure to appear to be "regarded as insubordination."

66.     Other faculty members have been allowed, especially after submitting physician's notes or other similar documentation of the need for an absence, to take a day away from campus during periods where no classes were being taught without threat of termination or other reprisals.

67.     On August 21, 2009, Dr. Hubbard, upon learning of the request for FMLA leave, threatened reprisal against Dr. Mezu in a letter, again threatening her with termination.

68.     Morgan State did not respond to Dr. Mezu's FMLA leave request for the next several weeks.

69.     Because of her daughter's condition, Dr. Mezu began her leave as she had notified Morgan State that she would.

13

70. Despite a neurosurgeon's report that Dr. Mezu's daughter suffered the damaging brain condition described above, Morgan State did not respond to Dr. Mezu's request until September 18, 2009.

71. On September 18, 2009, more than five weeks after Dr. Mezu applied for leave, Morgan State replied that "your request for leave the Family and Medical Leave Act for the period August 31, 2009 until October 2, 2009 is denied."

72 .Morgan State demanded further unnecessary explanation from Olachi Mezu's physician before it would consider granting family leave time.

73. Dr. Mezu contacted her daughter's physician to obtain that further explanation that she forwarded to Morgan State on September 25, 2009.

74. Dr. Mezu also again filled out a request for FMLA leave, dated October 6, 2009, seeking leave until December 4, 2009, because her daughter's physician had extended the period required for's recuperation until another review on or around December 4, 2009.

75. Grant did not respond to this renewed FMLA leave application until more than a month later, on November 13, 2009.

76. On that date, Grant wrote, "you have been placed on a leave without pay status effective immediately. Please be mindful that with the appropriate authorization, retroactive reimbursement of previously paid salaries may be required." The letter did not even refer to the FMLA request.

77. This letter was not even written until three weeks before Dr. Mezu's requested leave time was due to end.

78.     Eleven days later, on November 24, 2009, Dr. Mezu received a letter from the state Department of Budget and Management stating that, as of the pay period ending November 17, 2009, and going forward every two week pay period after that, she was responsible for $817.37 or else she would have no insurance coverage.  That is, unless she, on unpaid leave with no income, paid over $1600 a month, she would be uninsured.

79.     Dr. Mezu was forced to borrow the money to pay her insurance premiums.

80.     Dr. Mezu returned to work, as scheduled, on December 4, 2009.

81.     Despite returning to work, she did not receive any salary or benefits from the university until January 20, 2010—more than six weeks after she returned to work. Up till now, despite assertions to the contrary, Dr. Mezu has not been fully reimbursed for the three payments of $817.37 ($2,452.11 total) paid directly to the Maryland State Department of Budget and Management to maintain her health insurance.

Since Dr. Mezu has returned to work, Hubbard has continued to engage in constant acts of retaliation against Dr. Mezu, attempting to create a record against her.

82.     These include the following:

a.  Despite constant requests, Dr. Mezu has not been supplied with a working computer, and thus cannot check her email, despite this being a major means of communication within the university community.

b.  On March 18, 2010, Dr. Hubbard wrote in a memorandum: "I [Dr. Hubbard] recently learned from Catttie Ambrose, a Ph.D. Candidate, that she has been trying to contact you [Dr. Mezu], without success, and learn of the grade that she received in a women's writers course she took from you in 2008 Fall Semester.  Please contact Mrs. Ambrose at your earliest

15

convenience." The memorandum of course was meant to make Dr. Mezu look bad and build a record against her. However, Dr. Mezu did not teach a "women's writers [sic] course" in the fall of 2008; no one named Catttie [sic] Ambrose was in any of Dr. Mezu's classes that semester; all grades in all courses from all of Dr. Mezu's courses are copied to Hubbard's office; and it is the responsibility of the registrar to inform students of their grades. Moreover, Dr. Mezu's office phone number and office hours are advertised, so any student can reach her.

c. Hubbard has provoked other attempts to raise false claims about Dr. Mezu's performance and compliance with university rules and regulations.

d. Hubbard has refused to reinstate her to teach Eng 852: Postcolonial Theories and Literature featured for Spring Semester 2010, a doctoral course Dr. Mezu designed and defended at the Graduate Committee, Departmental and University Curriculum levels.

e. Hubbard has continued to humiliate Dr. Mezu by assigning to her four undergraduate beginners' courses normally taught by her graduate students thereby virtually removing her without cause or justification as a Graduate Faculty contrary to university regulations.

f. Hubbard has punitively assigned Dr. Mezu four (4) undergraduate beginners' courses when as a Graduate faculty supervising Masters and Doctoral dissertations university regulations prescribe that Dr. Mezu should not teach more than three courses.

### COUNT I—TITLE VII: Retaliation

84. The allegations of paragraphs 1-83 are incorporated herein as if set forth again at length.

85. Morgan State, and its employees Grant and Hubbard, are aware of the First Action and the still pending Second Action.

86. The actions listed in paragraphs 38-83, under the heading "Recent Hostile Actions Cognizable Under Title VII," were actions undertaken by Grant, Hubbard and Morgan State acting through Grant and Hubbard, that had the purpose or effect of creating an intimidating, hostile, or offensive working environment, and the purpose or effect of unreasonably interfering with Dr. Mezu's work performance.

87. The actions listed in paragraphs 38-83, under the heading "Recent Hostile Actions Cognizable Under Title VII," were actions undertaken by Grant, Hubbard and Morgan State acting through Grant and Hubbard, that had the purpose or effect of otherwise adversely affecting Dr. Mezu's employment, including depriving her of her duly entitled leave for pressing personal needs on the same terms as that leave was available to similarly situated Morgan State faculty, and depriving her of any salary or benefits for more than six weeks, as well as depriving her of pay equal to similarly situated members of the Morgan State faculty

88. These actions were taken for the purpose of retaliating against Dr. Mezu for filing charges with the EEOC and for filing the First and Second Actions.

89. Morgan State and its employees Grant and Hubbard are aware that Dr. Mezu is a black woman of Nigeria of Igbo ethnic origin.

90. Dr. Hubbard has expressed hostility towards Dr. Mezu's Igbo ethnic origin as described in the incorporated allegations.

91. These actions were taken for the purpose of retaliating against Dr. Mezu because of her Igbo ethnic Nigerian origin.

92. These retaliatory actions have created a hostile working environment for Dr. Mezu

93. These retaliatory actions have caused Dr. Mezu to suffer emotional, psychological,

17

physical and financial harm.

## COUNT II—FMLA Interference

94. The allegations of paragraphs 1-93 are incorporated herein as if set forth again at length.

95. Dr. Mezu was eligible for the protections of FMLA.

96. Morgan State was covered by the FMLA having in excess of 500 employees.

97. Dr. Mezu was entitled to leave under the FMLA for the period she sought to assist her daughter following her daughter's life-threatening brain surgery.

98. Dr. Mezu gave sufficient notice of her intent to take FMLA leave.

99. Morgan State failed to respond in a timely fashion to Dr. Mezu's FMLA leave request.

100. Furthermore, Morgan State denied Dr. Mezu of her right to leave under the FMLA despite her entitlement to such leave.

## COUNT III—FMLA Retaliation

101. The allegations of paragraphs 1-100 are incorporated herein as if set forth again at length.

102. Dr. Hubbard, acting on his own and on behalf of Morgan State University, threatened Dr. Mezu with termination or other discipline after she applied for FMLA leave in August of 2009.

103. Dr. Hubbard did so because he learned she had applied for FMLA leave.

104 Although he had no basis for knowing if Dr. Mezu was going to receive the leave or not, Dr. Hubbard made these threats even before the time Dr. Mezu had indicated her leave would begin.

105. The purpose of these threats was to deter Dr. Mezu from taking a leave to which she was entitled and to retaliate against her for applying for such leave.

18

106. Morgan State willfully refused to respond in a timely fashion to Dr. Mezu's leave request in retaliation for her application for that leave.

107. In retaliation for her application for FMLA, Morgan State willfully refused to grant such leave despite the fact that Dr. Mezu was entitled thereto.

108. Morgan State willfully refused to pay Dr.Mezu any salary or benefits for more than six weeks after she returned from leave as an act of retaliation against her for applying for leave.

109. Even if Dr. Mezu had been fully reimbursed (which is not the case as stated earlier in this supplemented complaint), that reimbursement came too late to prevent Dr. Mezu from suffering the following injuries:

110. Because Dr. Mezu was not paid, under real duress, Dr. Mezu borrowed the sum of $817. 37 every two weeks for a total of **$2,452.11** still only partially reimbursed as of today to pay the State of Maryland Department of Budget and Management (DBM) to maintain health insurance for her family and to prevent the insurance from being terminated with the attendant consequence as warned by DBM **"Failure to pay the total amount for the referenced pay period will result in cancellation of benefits for the remainder of this plan year, even if deductions resume in future pay periods [DBM** emphasis]. If your coverage is canceled, your next opportunity to enroll will be during the next open enrollment period for an effective date of July 1 of the next plan year [2010]."

111. Because Dr. Mezu was not paid her salary and fringe benefits as programmed between November 3, 2009 and January 16, 2010, Dr. Rose Mezu, suffered incalculable damages as evidenced by the documents attached to the Supplemental Affidavit of Plaintiff, Rose Mezu dated 1/28/2010.

Case 1:09-cv-02855-WMN Document 42 Filed 06/03/10 Page 20 of 23

112.     Dr. Mezu was denied her right to be paid like other employees during the six (6) pay periods ending November, 17, 2009, December 1, 2009, December 15, 2009, December 29, 2009, January 12, 2010 and January 26, 2010.

113.     Because Dr. Mezu was not paid as and when due, all credit card payments normally and routinely made by direct debit from her (Municipal Employees Credit Union) MECU account (where her Morgan State University payroll account is domiciled) to several agencies including MECU and NorthWest Federal Credit Union NWFCU) were dishonored;

114.     Because Dr. Mezu was not paid as and when due, all loan payments (including car loan) made biweekly by direct debit from her MECU (Municipal Employees Credit Union) payroll account to NWFCU were dishonored;

115.     Because Dr. Mezu was not paid as and when due, she was kicked out of the National City Mortgage Equity Acceleration Program made bi-weekly by direct debit from her MECU payroll account to National City Mortgage now PCN Mortgage.

116.     Because Dr. Mezu was not paid, she lost this savings of over $100,000.00 over the life of the loan.

117.     Because Dr. Mezu was unable to pay her car Insurance with GEICO Insurance, a cancellation notice (just like the Health Insurance cancellation notice from the State of Maryland Department of Budget and Management) was issued to her with all the dire consequences of not being able to drive the car on the road.

118.     Because Dr. Mezu was not paid, she was unable to pay for her trip to Nigeria to attend her late Mother Bessie Chiege Okeke's Memorial Service first scheduled for

December 27, 2009 and postponed to January 2, 2010 in the hope that she would be able to attend.

119. Dr. Mezu could still not raise the funds to attend the ceremony to pay the final respects to her late mother in accordance with an age-old Nigerian lore and custom.

120. Because Dr. Mezu was not paid, she was unable to pay for the supply of heating oil to heat her home. Dr. Mezu suffered the worst embarrassment of her life when the heating oil for her residence finished on New Year's Eve (Dec 31, 2009) and no deliveries could be made until January 4, 2010 and Dr. Mezu had no money to pay to enable the delivery to be made.

121. Family members, children, grandchildren (including premies), in-laws and relations invited to a long scheduled New Year's dinner to celebrate the recovery of Dr. Olachi Mezu suffered immeasurably. It was cold beyond comfort.

122. Because Dr. Mezu was not paid, she watched and cried in shame and subdued humiliation at the suffering and calamity following the Haiti earthquake unable to text even $10.00 to the Red Cross.

123. Because Dr. Mezu was not paid and could not meet her scheduled payments, some of these organizations filed negative reports to the Credit Reporting Agencies immediately and this wrecked incalculable havoc on her credit score and rating.

124. Dr. Mezu's applications for credit to alleviate the misery were denied.

21

**RELIEF SOUGHT**

Plaintiff therefore respectfully requests that this Honorable Court provide all such relief as may

be just and equitable, including

1. Injunctive relief as just and equitable;

2.  Back pay as adjustment for the retaliatory lower pay and cost of living increases to which Dr.

Mezu has been subjected based on Dr. Hubbard's retaliatory negative recommendations;

3.  Damages as appropriate for interference with Dr. Mezu's rights under the FMLA;

4.  Damages as appropriate for retaliation against Dr. Mezu's exercise of her rights to seek leave

under the FMLA;

5.   Attorneys fees;

6.  All other remedies which the Court may determine are just and equitable.

7.   Dr. Mezu respectfully requests jury trial.


Dated: June 4, 2010



                                        Respectfully Submitted,

                                         /S/ C. Valerie Ibe, Esq.
                                         Law Offices of C. Valerie Ibe,
                                         A  Professional L aw Corporation
                                        23614 Nadir Street
                                        West Hills, CA 91304
                                        Telephone: 818-346-8777
                                        Email: Kancvi@aol.com
                                        Bar ID: 94234
                                        Counsel for Plaintiff, Rose Ure Mezu

/S/ John M. Singleton, Esq.
Singleton Law Group
400 Redland Court, Suite 107
Telephone: 410-902-0073
Fax: 410-902-7372
Email: jmsingleton@sgt-law.com
Bar ID: 02275
Counsel for Plaintiff, Rose Ure Mezu