## <u>APPENDIX</u>

Defendant produced several examples of what it purports to have been improper behavior during the deposition.  Not surprisingly, defendant was selective in quotation, making sure relevant testimony was not mentioned, as that testimony renders defendant's charges hollow.

1.  Parsing out each example defendant gives, the first from page 10 of the memorandum:

Page 34

Q Let's look at these documents here. This is December 8th, 2008 a document that is signed by you to Doctor Hubbard. That's Exhibit No. 1. There is a December 8th, 2008 document signed by you to Doctor Grant, and there is a December 11th email from you to Doctor Grant, copy to Dolan Hubbard, and that is No. 3. Let's take No. 1. Do you recognize that document?

A Which is No. 1?

Q The Burial of a Parent.

A Yes.

Q Why did you write this document?

A Because I received a letter from America while I was burying my mother, telling me they had denied FMLA Leave. The forms they had given me and I had filled them out. Suddenly, they told me I was not entitled to FMLA Leave. They told to apply for bereavement. So, I applied for bereavement.

Q That was on December 8th? The next letter is Burial of a Parent, to Doctor Armada Grant, from

35

you. Why did you write this letter?

A Well, what the letter say, when I came to the office --

MS. IBE: Objection. The document speaks for itself.

Q I said, why did you write the letter?

MS. IBE: She wrote it.
MS. SWANN: Excuse me.
Q Why did you write the letter?
A Why did I -- in answer to what she asked me
to write.

Thus defendant asked why Dr. Mezu wrote letters called "Burial of a Parent" to both her

chairperson and the HR director of the school Dr. Mezu gave a long, detailed answer-- because

after being told to apply for one sort of leave before she left for her mother's funeral, she was

told her request for that sort of leave was denied and she was told she had to re-apply for a

different sort of leave.  After giving that answer, she was immediately, again, asked why she

wrote that same letter on the same day to the other recipient.  She answered "what the letter

say", and ""in answer to what she asked me to write."  In between there was an objection, but it

did not keep counsel from getting an answer-- and counsel responded, at line 12, "That's fine."

2.  The second example defendant gave  (memorandum at 11) is from pages 35-36:

The third document,
the Bereavement Leave Document, you wrote this to Miss
Grant on December 11th and why did you write this
email?
A Which email?
Q It is the last document.
MS. IBE: Objection. The document speaks
for itself. The reasons are in there.
MS. SWANN: Well, she can still answer.
MS. IBE: The reasons are in there.
MS. SWANN: She can still answer the
question.
Q Why did you write this, because you had
already written her on December 8th?
A I am writing her -- I am writing her -- I
could not write by hand, I had to send email. It is
the same letter.
Q So, it is the same letter. So, you were
just writing it for what reason, because you sent the

letter, she hadn't received it yet, so you were sending it by email? I am just trying to find out why you wrote --

A I only sent one letter by email because that was the only mode of correspondence.

Q The date on the email is December 11th. The date on the letter is December 8th. I am trying to find out why they are different dates?

A It was written December 8th. I was able to get access to email and send it to her.

Again, counsel sought to learn why a document was written; and the witness answered in full.

Plaintiff's counsel' s objections did not interfere with that discovery.

3. On pages 11-12,, defendant cited a number of examples of objections taken out of context to questions about whether burial of a parent is a reason for FMLA leave. The relevance of those questions is minimal, since plaintiff never contended that she should have been granted FMLA leave to take care of her mother's burial. (See Amended Complaint). But defense counsel received answer to the question of why Dr. Mezu filled out an FMLA leave request:

Page 47:

I don't walk into HR Associates. When I go to them, I go as an employee and say, "I lost my mother." I am suffering from a whole lot of emotional shock. They give me a form to fill out. That was the most appropriate box I could fill out and I put in burial there. So, I left on November 22nd. If they had a question, they could have contacted me before I left.

Defense counsel continually asked plaintiff why she filled out an FMLA form, and she was repeatedly told that this was the form she was handed. She freely admitted the form was not suited for the leave she sought, but this was the form she was handed.

Page 39:

Q Is your allegation that giving you a form
that was for FMLA, when they knew it was Bereavement
Leave, is that your allegation, that it was retaliation
under Title 7?
A Giving me the wrong form, if it is the
wrong form.
Q Now, did you look at the form when they
gave it to you?
A I had just lost my mother. I wanted leave.
Q Did you look at the form?
A I filled it out.
Q Did you look at the form?
A I believe I have answered.

It is impossible to understand what defense counsel thinks it does not now know.  Dr. Mezu's

mother died, she asked for leave to bury her mother, she was given FMLA forms to complete,

she realized they were not a good fit for her situation, but they were what HR told her to

complete, and she of course looked at the form sufficiently to fill them out.  Again, defendant

got the discovery she sought-- whether she likes the result or not.

4.  On page 13, defendant claimed she was not able to get an answer to the question about how

long was sufficient time for plaintiff to bury her mother-- but that is a lie.  Defendant cited only

bits of the deposition out of context.  She ignored the following:

page 58:

A I understood it to mean that I was far
away, handling a very traumatic experience, and all
they can do after giving me the wrong form is badger.
It takes three days to travel to Nigeria, when you give
me five days to bury my mother.

page 65:

A Let me repeat what I said. It takes three
days to travel to my hometown to bury my mother.

page 70:

A When you bury somebody in my home, you don't just bury and take off.
Q Okay.
A I am the first daughter. So, I have to make sure that all of the burial, traditional ceremonies that she was entitled to. You don't just put her in the grave. There are things to do, and I arrange for her, and you know, so, I mean I was so far away.

5.  At page 14, finally getting to questions that were relevant to this action, defense counsel

claims it was improper for plaintiff's counsel to remind defense counsel of her duty to ask

questions that would elicit answers, not lengthy narratives, about what happened to Olachi

Mezu.  But defense counsel got the answers she wanted anyway, though by that time the

witness had grown quite frustrated with the constant repetitive and unfocused questions:

page 139:

A She developed -- she suddenly had a headache coming back from New York, and we rushed her to the nearest CVS, and her blood pressure was very high. So, we called 911 to take her to the community hospital in New Jersey. They couldn't handle her case. It was discovered that she had an aneurism [misspelling in transcript].

p. 140:
They couldn't handle her case. So, she had called Hopkins and explained that she had an aneurism. The doctor looked at the information. They faxed to him all of the tests, and, in the morning, they sent a helicopter to bring her to Hopkins, where they had an operation August 4th.
Q August 4th was the operation. That was 2009. Was the operation a success?
A It was an operation they told us had a lot of risks. 30 to 50% of people who have her kind of

5

aneurism die. They said to us that she could die on the operating table, that she could have a series of strokes, that she could go blind because it was imbedded in a blood vessel in her eye -- near her eyes. They told her that she could become a vegetable and not have any memory. They told her she could have strokes and all kinds of bad risks. It was a seven and a half hour operation, but she survived the aneurism.

What more did defendant really want in a narrative than that?

6. Defendant then pejoratively assesses the following answer as "evasive."

p. 141:

Q So, how long did your daughter remain in the hospital?
A I can't quite remember. I can't remember right now.

Given defense counsel's inability to remember what claims are made, and which claims are not

made, in the Amended Complaint, inability to remember to answer the complaint on time,

inability to remember to respond to discovery requests, to respond to a motion to compel, or

even motions for partial summary judgment, it is rather surprising defense counsel considers

this answer "evasive."  Surely defense counsel would not prefer a witness to guess at the exact

number of days a person was in a hospital last year, when those same facts are readily

ascertained in documents that witness provided to defense counsel.

7. At page 15, defendant quotes some of the following to claim she was thwarted in obtaining

an answer:

p. 146:

If your daughter was in the hospital, would you have been able to come to this meeting?
MS. IBE: She already responded.

6

MS. SWANN: Excuse me, she is beginning to answer.

MS. IBE: She already responded.

A I was telling you that I had already answered you that question.

MS. SWANN: So, you are refusing to answer that question. That is on the record.

It is on the record that defense counsel claimed the witness was refusing to answer, but defense counsel apparently forgets that the record also shows she was wrong in so claiming. To the contrary, defense counsel had in fact received an answer to her question-- she just did not appear to get the answer she wanted so she ignored it. The answer came several pages earlier, but defense counsel refused to let the answer be the answer:

p. 142:

Q Okay. So, even though you were able to come on the 12th and 13th, you weren't able to come to meet with him on the 20th?

A I couldn't. She is recovering. Everyday, she was doing better and she was walking all about.

p. 145:

A Yes. He wrote to me and I couldn't come. I said to him because I was looking after my daughter.

Q This was to set up a meeting at 2:00 p.m. in the Conference Room. Why, again, couldn't you come to the meeting? Your daughter, was she still in the hospital at that time?

A I can't answer that because I don't remember, you know, when she was discharged, but I know I was taking care of her.

8. Defendant even calls it "evasive" when plaintiff stated she could not remember if she had a piece of paper showing that she sent something to Dolan Hubbard, though she testified she knew she had in fact done so. (Memorandum at 16). Again, defense counsel seems to believe

that anything less than perfect memory of every scrap of paper ever written is "evasive," an oddly demanding expectation of human memory, and one defense counsel clearly fails-- she cannot even remember what the Amended Complaint in this action says.

9.   Defense counsel then began to press plaintiff about private information concerning other people who are not parties to this action, not witnesses to this action, and whose privacy plaintiff sought to protect.  Defendant details plaintiffs refusal to answer these questions at memorandum 17-20.   Plaintiff's counsel represents to the Court that Dr. Mezu found these inquiries morally objectionable, and that to answer would have violated the privacy of persons whom she loves.

On that point, defense counsel spent substantial time trying to press to determine the name of Olachi Mezu's husband, and where she lives.  Olachi is not a party and her mother wanted to protect her privacy.  As for her relationship with her husband, as defense counsel knows, Olachi and her husband are not living together, and their personal relationship and its struggles are quite simply none of defense counsel's business.[1]  If the point of the inquiry was to suggest that Olachi's mother should not have taken FMLA leave because Olachi's husband could have cared for her, the short answer is they are not living together.

---

[1]     *See* Dr. Sebastian Mezu's deposition, at 9:
Q What is the last name?
A Ndubuisi.
Q How do you spell that?
A N-d-u-b-u-i-s-i.
Q Where does he live?
A I don't know.
Q Does he live with your daughter?
A No.

10.    Attached here is an analysis of the deposition by Defendants' Attorney Sally Lotz Swan of the Plaintiff Dr. Rose Ure Mezu on August 25, 2010

**ANALYSIS OF THE DEPOSITION BY DEFENDANTS' ATTORNEY SALLY LOTZ SWANN**
**OF PLAINTIFF DR. ROSE URE MEZU ON AUGUST 25, 2010**
**MEZU v MORGAN STATE UNIVERSITY *et alia*  Civil Action No:1:09-cv-02855-WMN**



- Intro & Closing Remarks
- Nigeria
- Children
- Personal
- Teaching
- Mother's Burial
- FMLA SPRING 2008
- Sabbatical Leave 2007
- Excuse DutyAug2009
- FMLA 2009 Leave
- Recording Accusation
- Unpaid Salary
- Damages

1

**ANALYSIS OF THE DEPOSITION BY DEFENDANTS' ATTORNEY SALLY LOTZ SWANN**
**OF PLAINTIFF DR. ROSE URE MEZU ON AUGUST 25, 2010**
**MEZU v MORGAN STATE UNIVERSITY *et alia*  Civil Action No:1:09-cv-02855-WMN**



2

ANALYSIS OF THE DEPOSITION BY DEFENDANTS' ATTORNEY SALLY LOTZ SWANN
OF PLAINTIFF DR. ROSE URE MEZU ON AUGUST 25, 2010
MEZU v MORGAN STATE UNIVERSITY *et alia* Civil Action No:1:09-cv-02855-WMN

| Intro & Closing Remarks | Nigeria | Children | Personal | Teaching | Mother's Burial | FMLA SPRING 2008 | Sabbatical Leave 2007 |
|---|---|---|---|---|---|---|---|
| **33.5** | 53.5 | 684 | 68 | 87 | 1776 | 667 | 37 |

| Excuse DutyAug2009 | FMLA 2009 Leave | Recording Accusation | Unpaid Salary | Damages |
|---|---|---|---|---|
| **41.5** | 69.5 | 1368 | 136 | 174 |

**No of Lines of deposition**



| Table Chart | Pie Chart |
|---|---|

| **234 PAGES TOTAL IN DEPOSITION RECORDS** | 4899 LINES TOTAL IN DEPOSITION |
|---|---|

**Prepared by Plaintiff September 18, 2010 copyright 2010**

3

An analysis shows that there are approximately 234 pages of testimony excluding index and appendix with approximately 4899 total lines excluding notations for break and recess.  The testimony can be generally broken down into the following descriptive areas with the approximate number of lines devoted to the area:

| DESCRIPTION | LINES IN DEPOSITION | PAGE NO  IN DEPOSITION - (NO OF LINES) |
|---|---|---|
| Introductory and Closing Remarks | 33.5 | 7 (21); 8 (4.5); 240 (8) |
| Nigeria | 53.5 | 8 (16.5); 9 (21); 10 (16) |
| Discussion of Dr. Rose Mezu's Children and Family | 684.00 | 10 (5); 11 (21); 12 (21); 13 (13); 14 (21); 15 (13); 137 (5);  138 (21); 139 (21); 140 (21); 141 (21); 142 (21); 143 (21); 167 (18); 168 to 174 (21 each); 176 (8); 177 to 189 (21 each); 190 (13) |
| Personal Questions and Issues | 68.00 | 15 (8); 16 (4); 20 (14); 21 (21); 22 (21) |
| Teaching | 87.00 | 16 (17); 17 (21); 18 (21); 19 (21); 22 (21) |
| Burial of Dr. Rose Mezu's Mother | 1,704.00 | 23 to 46 (21 each); 47 (19); 48 (7); 49 to 65 (21 each); 66 (19); 69 to 106 (21 each) |
| FMLA Spring 2008 | 667.00 | 47 (2); 48 (14); 67 (21); 68 (21); 107-135 (21 each) |
| Sabbatical Leave 2007 | 45.00 | 18 (8); 136 (21); 137 (16) |
| Excuse Duty August 2009 | 147.00 | 144 to 150 (21 each) |
| FMLA Leave August 31, 2009 to December 4, 2009 | 612.00 | 151 to 166 (21 each);  167 (3); 227 to 239 (21 each) |
| Accusation of Recording Proceedings | 34.00 | 175 (21); 176 (13) |
| Unpaid Salaries November 2009 to January 2010 | 92.00 | 190 (8); 191 to 194 (21 each) |
| Damages and Accelerated Mortgage Program | 672.00 | 195 to 226 (21 each) |

Prepared by Plaintiff September 18, 2010 copyright  2010 – ROSE **MEZU v MORGAN STATE UNIVERSITY** *et alia*  Civil Action No:1:09-cv-02855-WMN

4